Employers Insurance of Wausau *vs.* Charles George, Jr., & others[1] (and two companion cases[2]).

No. 95-P-839.

Middlesex. May 28, 1996. - November 26, 1996.

Present: Dreben, Gillerman, & Laurence, JJ.

*Insurance,* Pollution exclusion clause, Defense of proceedings against insured. *Contract,* Insurance. *Hazardous Materials. Consumer Protection Act,* Insurance. *Words,* "Sudden and accidental."

Insureds under general liability insurance policies did not demonstrate, in opposition to the insurers' motions for summary judgment, that certain discharges of pollutants in 1980 and 1983 were "accidental" so as to fall within the "sudden and accidental" exception to the pollution exclusion clause in the insurance policies, and the judge correctly entered summary judgment for the insurers. [724-727]

An insurer's contractual obligation, as set forth in certain nonwaiver agreements, to participate in the defense of its insureds until it exercised its reserved right to disclaim coverage for defense or indemnity did not give rise to a contractual obligation, separate from the policies in question, to participate in the defense of the underlying actions. [727-729]

Insurers that made a legally correct disclaimer of coverage under pollution exclusion clauses in the policies in question did not act unfairly or deceptively within the meaning of G. L. c. 93A, § 2, and any violation

[1]Charles George, Sr. (Charles, Sr.), Dorothy G. George and James George, individually and as trustees of the Charles George Land Reclamation Trust (trust), Charles George Trucking Company, Inc. (CGTC), Aetna Casualty and Surety Company (Aetna), Fireman's Fund Insurance Company, First State Insurance Company, and Continental Insurance Company. We refer to Charles, Sr., CGTC, Dorothy, and the trust as the Senior Georges, to Charles, Jr., and James as the Junior Georges, and, where appropriate, to the Senior and the Junior Georges, collectively, as the Georges.

[2]Aetna Casualty and Surety Company *vs.* Charles George, Jr., & others; James George, individually and as trustee, & others *vs.* Fireman's Fund Insurance Company & others. The three actions sought declarations as to the insurers' duty to defend and were consolidated. Two of the actions were brought by insurance companies, and one was brought by the Junior Georges. Some of the original claims or counter-claims asserted against certain of the insurers have been settled.

of G. L. c. 176D, § 3(9)(*d*), for the insurers' alleged denial of coverage without a reasonable investigation could not have prejudiced the insureds. [729-730]

In a civil action, a theory of recovery could not be raised for the first time on appeal. [730]

CIVIL ACTIONS commenced in the Superior Court Department on March 10, 1986, April 13, 1988, and February 13, 1991, respectively.

The cases were heard by *James F. McHugh, III,* J., on motions for summary judgment.

*Stephen Wald* for Charles George, Jr., & another.

*Roy P. Giarrusso* for Charles George, Sr., & others.

*Gary D. Centola* for Fireman's Fund Insurance Company.

*Michael F. Aylward* for Continental Insurance Company.

*Anthony R. Zelle* for Employers Insurance of Wausau.

*John P. Graceffa* for Aetna Casualty and Surety Company.

DREBEN, J. The primary question in this appeal by the Georges is whether certain discharges of pollutants fell within the "sudden and accidental" exception to the pollution exclusion clause in their insurance policies. If so, the Georges' insurers would have a duty to defend the Georges in actions brought against them by the United States and the Commonwealth. A Superior Court judge entered summary judgment for the insurers declaring: (1) that none of them had an obligation to defend and indemnify the Georges in actions brought in 1985 by the United States and the Commonwealth against the Georges for damages caused by hazardous waste operations at a landfill in Tyngsborough and Dunstable[3] because the releases at the landfill were not "sudden and accidental"[4]; (2) that Wausau did not have a contractual duty after June 22, 1992, independent of the insurance policy, to defend the Senior Georges arising out of two nonwaiver agree-

_____

[3]We refer to the actions brought by the United States and the Commonwealth as the underlying actions or the sovereign actions.

[4]The judge reversed an earlier order entered by him on April 30, 1991, which had held that Aetna had a duty to defend. He changed his position relying on *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.,* 412 Mass. 330 (1992), and *Lumbermens Mut. Cas. Co.* v. *Belleville Indus., Inc.,* 938 F.2d 1423, 1430 (1st Cir. 1991), cert. denied, 502 U.S. 1073 (1992), both decided subsequent to his earlier ruling.

ments[5]; and (3) that the respective insurers did not violate G. L. c. 93A or c. 176D. This appeal involves all three rulings. We affirm the judgment.

1. *Background.* Charles, Sr., purchased the landfill site and commenced operations there in 1967. Other Georges were also involved in its operation at various times from 1971 until 1983, when a judge of the Superior Court ordered the landfill closed. From 1973 to 1976, hazardous waste was disposed of at the landfill.

The underlying lawsuits were preceded by an earlier action brought against the Georges by the Commonwealth in November, 1976, after the Georges had failed to comply with an order of the Department of Environmental Protection (DEP)[6] to abate conditions at the landfill which allegedly were in violation of G. L. c. 111, § 150A. Even after the filing of the 1976 complaint, official inspections showed continuing discharges of leachate at the site.[7] In March, 1978, the Commonwealth and the Georges entered into a consent judgment, modified on December 17, 1981, requiring the Georges to implement corrective measures for leachate control.

2. *The underlying actions and the terms of the policies.* Referring to the same sovereign complaints as are involved in the present case, this court in *Landauer, Inc.* v. *Liberty Mut. Ins. Co.*, 36 Mass. App. Ct. 177, 178 (1994), described them in part as follows: "In 1985, the United States and the Commonwealth filed suits . . . . in the United States District Court for Massachusetts against a number of individuals and companies [predominantly the Georges], seeking to charge them with liability for the costs of cleaning up the contamination of soil and water near the Charles George Landfill in Tyngsborough and Dunstable." The Commonwealth's complaint also contained allegations referring to its prior action against the Georges brought in 1976, stating: "In judicial proceedings extending [from November 1976] through June,

[5]Other claims relating to Wausau's nonwaiver agreements were not adjudicated, and the judge made a determination under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), that there was no just reason to delay entry of a final judgment.

[6]The agency was then called the Department of Environmental Quality Engineering. For simplicity, we will refer to it as DEP.

[7]Leachate, produced by the natural decaying of garbage in a landfill, is precipitation which has percolated through refuse to the bottom of a landfill. It can mix with, and contaminate, groundwater.

1983, the Commonwealth sought to compel the defendants to bring the landfill operations into compliance with state law."

Matching the allegations of the pleadings with the language of the policy,[8] especially the term "sudden and accidental," *Landauer* held that "speculation that, within the routine operations of the landfill, any single discharge may have occurred suddenly and accidently . . . cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental occurrence.'" 36 Mass. App. Ct. at 181-182, quoting from *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.*, 412 Mass. 330, 338 (1992).

While different insurers are here involved,[9] each of the pertinent policies contains a provision (either identical to or differing only in immaterial respects from that of the insurer in *Landauer, supra* at 180) stating that the policy does not apply to:

> "property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Despite the *Landauer* characterization of the sovereign complaints as asserting contamination "as a concomitant part of a regular business activity," *supra* at 181, the Georges, relying upon *Goodman* v. *Aetna Cas. & Sur. Co.*, 412 Mass.

---

[8]"[I]f the allegations of the complaint [in the underlying action] are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense." *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 146 (1984), quoting from *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 318 (1983).

[9]Since we find no duty to defend based on the policy exclusion, we need not specify the applicable period of each policy, although we note that some were not in effect at the time of one or both of the claimed sudden and accidental discharges relied upon by the Georges.

In *Essex Ins. Co.* v. *Tri-Town Corp.*, 863 F. Supp. 38, 40 (D. Mass. 1994), the court noted that since 1985, many insurers have dropped the "sudden and accidental" exception from the pollution exclusion in the standard policy, rendering the exclusion "absolute."

807, 812-813 (1992), and *Nashua Corp.* v. *First State Ins. Co.*, 420 Mass. 196, 201-203 (1995), lay stress on a 1980 fire and on a 1983 leachate spill as "sudden and accidental" discharges established on the record. They claim that although these incidents were not mentioned in the underlying complaints,[10] these occurrences were known or readily knowable to the insurers, see *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 167 (1983); *State Mut. Life Assur. Co.* v. *Lumbermens Mut. Cas. Co.*, 874 F. Supp. 451, 455 (D. Mass. 1995), and caused releases falling within the "sudden and accidental" exception to the pollution exclusion clause.[11] We turn to these events.

3. *The claimed sudden and accidental releases.* a) *The landfill fire.* In June, 1980, a devastating fire raged out of control at the landfill. The Tyngsborough fire department created a 100,000 gallon holding pond to pump water on the landfill, and estimates indicate that more than twenty million gallons were pumped onto the land. The water level rose, excessive leachate was generated, and contaminants leached into surface and underground waters both on and off site.

b) *The leachate spill.* Because of court orders in the earlier 1976 action brought by the Commonwealth, the Georges installed a system to prevent leachate from migrating from the site. On May 16, 1983, a DEP engineer noticed the malfunctioning of a pump causing overflow of leachate in the collection chamber. He told James to fix the problem, but instead of following acceptable procedures, James discharged

[10]The materials relating to the events allegedly meeting the "sudden and accidental" requirement were submitted to the motion judge after the Supreme Judicial Court's 1992 decision in *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.*, 412 Mass. 330 (1992).

[11]The Junior Georges also claim that the insurers were obligated to defend on the basis of the general allegations in the sovereign complaints. This contention, as well as their argument that the insurers had a duty to defend nonspecific claims "deemed saved" by a case management order of the Federal court in the underlying actions, is foreclosed by the decisions in *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc., supra* at 336-338, and *Landauer*, 36 Mass. App. Ct. at 181-182. The Junior Georges' claim, based on letters from the United States Environmental Protection Agency (EPA) notifying the Junior Georges that they were potentially responsible parties, see *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 693-697 (1990), fails for the additional reason that the record does not show that they ever informed the insurers of the EPA letters or claimed a right to defense based upon these letters.

the leachate into a catch basin from which it flowed into a brook.[12]

4. *The requirements of sudden and accidental.* To establish coverage, the Georges have the burden of proving that the releases came within the exception to the pollution exclusion clause. *Great N. Indus., Inc.* v. *Hartford Acc. & Indem. Co.,* 40 Mass. App. Ct. 686, 690 (1996). The exception requires that the release be both sudden *and* accidental. *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.,* 412 Mass. at 336-337. As interpreted in *Lumbermens Mut. Cas. Co.* v. *Belleville Indus., Inc.,* 407 Mass. 675, 680 (1990) (*Belleville I*), "sudden" has a temporal aspect; the release must be abrupt.

Citing *Goodman* v. *Aetna Cas. & Sur. Co.,* 412 Mass. at 812, and *Nashua Corp.* v. *First State Ins. Co.,* 420 Mass. 196, 208 (1995), the Georges claim that questions of material fact exist as to the character of the releases occasioned by the 1980 fire and the 1983 leachate spill. Unlike the records in *Goodman* and *Nashua,* however, the summary judgment record here with respect to the two releases is well developed. See *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.,* 412 Mass. at 338. A review of the record, in the light most favorable to the Georges, the parties opposing the motions for summary judgment, *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 438 (1995), demonstrates that the Georges have "no reasonable expectation" of showing that the releases were both sudden *and* accidental. See *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991).

In a well-reasoned and comprehensive memorandum, written prior to the issuance of the *Nashua* opinion, the judge ruled that the releases were neither sudden nor accidental within the meaning of the policies. Discerning support of *Lumbermens Mut. Cas. Co.* v. *Belleville Indus.,* 938 F.2d 1423 (1st Cir. (1991), cert. denied, 502 U.S. 1073 (1992) (*Belleville II*), in *Liberty Mut. Ins. Co.* v *SCA Serv., Inc.,* 412 Mass. at 336-338 & n.6, and in *Landauer,* 36 Mass. App. Ct.

---

[12]On May 19, 1983, when the DEP engineer inspected the pump chamber, he discovered that while James had emptied the chamber of leachate and had replaced the recirculation pump with a temporary pump, instead of being pumped into a tanker truck, leachate was being pumped into a catch basin and ultimately reached a brook. DEP immediately arranged for a hazardous waste contractor to pump the leachate into a tanker truck. Approximately 10,900 gallons of leachate had been discharged into the brook prior to the DEP's corrective action.

at 181-182, the judge found, on the basis of undisputed affidavits, that the George landfill was "close to the operation" described in *Belleville II.* He noted that the court in that case had rejected a contention that a fire and a rainstorm causing at least some pollution were sufficient to establish coverage and quoted from that opinion, *supra* at 1430, as follows:

> "It is . . . the nature of an insured's enterprise and its historical operations that determine the applicability of the policy provision. Belleville discharged pollutants as an ordinary part of its business operations; we simply cannot analyze these provisions as if it were a manufacturer of health foods that rarely, if ever, experienced a pollution-producing event."

As a second ground for denying coverage, the judge pointed out that there "is absolutely no doubt" on this record that the dispersal of waste materials on the site was a continuous process in the Georges' acknowledged business. "Both the fire and the leachate spill were polluting events that themselves arose out of the nonsudden and nonaccidental dispersal of waste at the site. Neither event, even if viewed in isolation, thus provides a basis for coverage."

When requested after the decision in *Nashua* to vacate the judgment, the judge declined, relying on his second ground, namely "the allegedly sudden and accidental dispersals of pollutants [were] undeniably dispersed earlier."

There is considerable support for the judge's conclusion, reiterated by the insurers, that the relevant discharges for purposes of construing the pollution exclusion are the initial discharges of pollutants on the landfill and not their subsequent escape to other sites. See, e.g., *A. Johnson & Co.* v. *Aetna Cas. & Sur. Co.,* 933 F.2d 66, 72 & n.9 (1st Cir. 1991)(applying Maine law); *St. Paul Fire and Marine Ins. Co.* v. *Warwick Dyeing Corp.,* 26 F.3d 1195, 1204-1205 (1st Cir. 1994)(applying Rhode Island law). See also *G. Heilman Brewing Co.* v. *Royal Group, Inc.,* 779 F. Supp. 736, 740 (S.D.N.Y. 1991), aff'd, 969 F.2d 1042 (2d Cir. 1992)(applying Michigan law); *Broderick Inv. Co.* v. *Hartford Acc. & Indem. Co.,* 954 F.2d 601 (10th Cir.), cert. denied, 506 U.S. 865 (1992). There is also authority to the contrary, see, e.g., *FL Aerospace* v. *Aetna Cas. & Ins. Co.,* 897 F.2d 214, 220 (6th Cir. 1990),

cert. denied, 498 U.S. 911 (1990)(applying Michigan law); *Sylvester Bros. Dev. Co.* v. *Greater Central Ins. Co.*, 480 N.W.2d 368 (Minn. 1992). Cf. *New Castle County* v. *Hartford Acc. & Indem. Co.*, 933 F.2d 1162, 1199-1203 (3d Cir. 1991), cert. denied, 507 U.S. 1030 (1993).

There is no Massachusetts appellate decision directly on point. The insurers refer to the language in *Belleville I*, 407 Mass. at 679, where the Supreme Judicial Court stated:

> "The sudden event to which the exception in the pollution exclusion clause applies concerns neither the cause of the release of a pollutant nor the damage caused by the release. It is the release of pollutants itself that must have occurred suddenly, if the exception is to apply so as to provide coverage."

They argue that, unlike the fire and explosion in *Nashua*, there is no evidence in this case that the 1980 fire itself generated a release of pollutants. It is therefore irrelevant whether the fire was sudden or accidental; what is important is that the pollutants were routinely placed on the landfill over a long period of time. The original discharges of pollutants are the relevant ones.

The scope of *Nashua* is not yet clear, and we need not decide whether the releases in this case were "sudden"[13] because, in any event, as the judge also determined, they were not accidental. An intentional and deliberate discharge cannot be "accidental" within the meaning of the "sudden and accidental" clause of the policy. *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 752 (1993). *Technicon Electronics Corp.* v. *American Home Assur. Co.*, 74 N.Y.2d 66, 75 (1989). *New York* v. *Amro Realty Corp.*, 936 F.2d 1420, 1427 (2d Cir. 1991). *Liberty Mut. Ins. Co.* v. *Triangle Indus., Inc.*, 957 F.2d 1153, 1157-1158 (4th Cir.), cert. denied, 506 U.S. 824 (1992)(applying New Jersey law). Thus if a third person discharged a pollutant intentionally, the pollution exclusion denies coverage, even to an innocent insured. *Polaroid, supra* at 752.

Here, the 1980 release resulted from the huge volume of

---

[13]The parties, at least the Georges, have framed the issue as being a contamination of the water table by the water used to extinguish the fire, rather than by the fire itself.

water used to extinguish the fire. As the deputy fire chief of Tyngsborough indicated in his affidavit:

> "I was aware . . . that the volume of water being used to control and extinguish the fire would cause contaminants from the landfill to be leached back to underground water supplies. It was obvious to anyone with access to the problem with the fire at the landfill that in resolving one problem, we were creating another."

Such "purposeful conduct," *New York* v. *Amro Realty Corp., supra* at 1427, — the release of contaminants by the influx of water into the burning landfill — was not "accidental." See *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litigation,* 870 F. Supp. 1293, 1350 (E.D. Pa. 1992)("[W]here . . . [a] substance, regardless of its content, is discharged intentionally, lack of knowledge of the substance's pollutant content does not make the discharge 'unintentional' or 'accidental' ").

Similarly, the 1983 leachate spill was not an accidental release caused by malfunctioning equipment; rather, the cause was an intentional act by James George, the pumping of leachate into a catch basin. See note 12, *supra.* The issue is not whether the release was negligent, rather than intentional, as James contends for the first time on appeal, but whether it was accidental. See *New York* v. *Amro Realty Corp.,* 936 F.2d at 1428. As the motion judge held, it was not.

5. *The Wausau nonwaiver agreements.* On February 4 and March 14, 1986, Wausau entered into nonwaiver agreements with the Senior Georges, under which Wausau advanced defense costs without admitting any duty to defend and without waiving its ability to deny coverage for defense or indemnity.[14] These agreements provided that "[p]ending this mutual agreement or disagreement concerning the existence

---

[14]These agreements provided that the Senior Georges and Wausau would "cooperate in the accumulation of information relevant to whether benefits [under the Wausau policy] exist; and if so, the extent of the benefits" and also that the Senior Georges and Wausau "agree that neither this agreement nor their respective efforts to investigate, evaluate, cooperate or settle with respect to the claims or benefits applicable under the policies shall in any way prejudice, waive, or estop their respective abilities to enforce all rights and obligations against the other, as set forth within said policies, as though no such agreement or conduct had occurred." The nonwaiver agreement executed on behalf of Charles, Sr., CGTC, and the trust

and extent of obligations under the insurance contract and commencing with this agreement," the Senior Georges and Wausau "agree that Wausau will participate in the defense of the [underlying actions] . . ., if so requested, as though such policies are applicable." Between April, 1986, and September, 1987, Wausau made payments in excess of $160,000 in connection with the defense of the Senior Georges. In September, 1987, when Wausau learned that the Senior Georges had accepted a tender of coverage for both defense and indemnification from another insurer, not a party to this appeal, it turned over the defense of the underlying actions to that insurer. Neither the other insurer nor the Georges sought payment from Wausau from September, 1987 until June, 1992. On February 13, 1991, Wausau filed its complaint for declaratory relief in which it denied any obligation to defend the Senior Georges. In addition, by letter dated May 19, 1992, Wausau gave express notice to the Senior Georges that Wausau was terminating its participation in their defense.[15]

The Senior Georges argue that the nonwaiver agreements created a separate contractual obligation on the part of Wausau to participate in their defense in the underlying actions. Deciding that the interpretation of the nonwaiver agreements was a question of law, see *Allstate Ins. Co.* v. *Bearce*, 412 Mass. 442, 446-447 (1992), and that the agreements were unambiguous, the judge determined, as reflected in the judgment, that Wausau had no contractual obligations under the nonwaiver agreements to pay for any defense costs incurred after June 22, 1992, in connection with the underlying actions. The Senior Georges were not entitled to more.[16]

The purpose of the nonwaiver agreements, from Wausau's perspective, was to obtain the Senior Georges' agreement that Wausau, by participating in the defense, did not waive its right to deny any duty to defend under its policy. *Merrimack Mut. Fire Ins. Co.* v..*Nonaka*, 414 Mass. 187, 189-191 & n.6 (1993). See also 14 Couch, Insurance § 51:91 (Rhodes rev.

contained a provision permitting Wausau to cancel its participation in their defense upon thirty days notice. The nonwaiver agreement executed on behalf of Dorothy did not contain such a provision.

[15]Wausau's May 19 letter giving notice of cancellation was sent to counsel for all the Georges, and all demanded payment from Wausau in June, 1992.

[16]Whether the duty terminated at an earlier date is not argued by Wausau and it has not filed a cross appeal.

2d ed. 1982). Its contractual obligation under the nonwaiver agreements was to participate in the defense until it exercised its reserved right to disclaim.[17]

Wausau asserted it had no duty of defense in its February, 1991 complaint, and reiterated its position in its May 19, 1992 letter. The judge did not relieve Wausau of its duty until June 22, 1992, and expressly left undecided both the Georges' claim of estoppel and their claim that Wausau failed to pay its proportion of the costs during the time it was participating in the defense. He held that these issues were fact based and could not be determined on the record before him. There was no error.

6. *The Georges' cc. 93A and 176D claims, other than the claims against Aetna.* The Georges assert that the denial of coverage by certain of the insurers without reasonable investigation constitutes an unfair claim settlement practice under G. L. c. 176D, § 3(9)(*d*),[18] for which they may recover under c. 93A, § 9. Relief under G. L. c. 93A, § 9, however, is not available respecting the landfill. Since the Georges were engaged in trade or commerce, any violation of c. 176D, § 3(9), is of significance only to the extent that the alleged wrongful conduct violated G. L. c. 93A, § 2 (unfair or deceptive acts or practices). A violation of c. 176D, § 3(9), without a violation under c. 93, § 2, does not support a § 11 claim under c. 93A. *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. at 754.

"As a general rule, an insurance company does not act unfairly or deceptively within the meaning of G. L. c. 93A, § 2, with respect to a claim made under a policy of insurance simply by making a legally correct disclaimer of coverage." *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 717 (1989). See *Lumbermens Mut. Cas. Co.* v.

[17]There is no merit to the Senior Georges' contention that the nonwaiver agreements required Wausau to participate until such time as a court of competent jurisdiction made a final determination on its duty to defend. No such limitation appears in the agreements. See *Travelers Ins. Co.* v. *Waltham Indus. Labs. Corp.*, 722 F. Supp. 814, 825-826 (D. Mass. 1988), aff'd in part and rev'd in part, 883 F.2d 1092 (1st Cir. 1989).

[18]Subsection 9 of c. 176D, § 3, as inserted by St. 1972, c. 543, § 1, provides, in pertinent part: "Unfair claim settlement practices: An unfair claim settlement practice shall consist of . . . (*d*) Refusing to pay claims without conducting a reasonable investigation based upon all available information[.]"

*Offices Unlimited, Inc.*, 419 Mass. 462, 468 (1995). Moreover, as the motion judge concluded, "even assuming an improper investigation and response . . . it is impossible to see how the insureds [in this case] were damaged when a proper response and a proper investigation would have allowed the insurers to disclaim all coverage." The judge properly entered summary judgment for the insurers on the Georges' statutory claims.

7. *The Senior Georges' cc. 93A and 176D claims against Aetna.* Having received notice of the Georges' claims for defense and indemnity respecting the underlying actions, Aetna reserved its rights pending a reasonable investigation. On March 10, 1986, Aetna disclaimed coverage by filing the first of the present actions seeking a declaration that it had no duty to defend or indemnify the Georges. As will be remembered, the judge had, prior to reversing his action on May 23, 1994, initially ruled on April 30, 1991, that Aetna had a duty to defend the Georges in the underlying actions. See note 4, *supra*. The Senior Georges argue that Aetna's failure to pay defense costs during the period the judge's initial ruling was in effect was a bad faith refusal to defend in violation of G. L. cc. 93A and 176D. There is no indication in the voluminous record, and the Senior Georges do not direct us to any, that this argument was raised in the Superior Court. The matter was also not addressed by the motion judge.[19] This new theory of recovery may not be raised for the first time on appeal. See *Poly* v. *Moylan*, 423 Mass. 141, 149 (1996). Moreover, the claim appears to have no merit. During the period that the judge's order was in effect, counsel for the Senior Georges controlled the underlying actions and Aetna paid the Senior Georges' respective counsel amounts, which appear to have been in full settlement of their claims against Aetna, for its share of defense costs.

*Judgment affirmed.*

---

[19]We also note that, although the Senior Georges sought by amendment to add additional claims against other insurers, they did not seek to add any claim against Aetna for violation of the judge's order.