Fabricant, J.
INTRODUCTION
This action presents the question whether Liberty-Mutual Insurance Company (“Liberty") is obligated to defend and indemnify Nashua Corporation (“Nashua”) with respect to certain claims made against Nashua for hazardous waste contamination. Presently before the Court are: Nashua’s Motion for Partial Summary Judgment regarding the duty to defend as against all the claims: Liberty’s Motion for Partial Summary Judgment as to the duty to defend against all the claims, and as to the duty to indemnify as to certain *434 of the claims; and each side’s motions to strike certain supporting materials submitted by the other.
FACTUAL AND PROCEDURAL BACKGROUND
Nashua is a manufacturing corporation with its principal place of business in New Hampshire. In the ordinary course of its operations, Nashua uses and disposes of various toxic substances.
Nashua purchased insurance policies from Liberty, including the following. For the years 1961 through 1989, Nashua purchased from Liberty Comprehensive General Liability (known as “CGL”) policies. For some of these years the policies are missing, no copies have been found, and the parties dispute certain terms. However, the existence and terms of the CGL policies for the years 1968, 1970, 1971, and 1974 through 1984 are not in dispute. Those policies provided that Liberty would indemnify Nashua for any sums that Nashua “shall become legally obligated to pay" as a result of “property damage occurring during the policy period,” subject to certain definitions and exclusions, and would defend Nashua against any “suit ... on account of such . . . property damage.” For the years 1971 through 1985, the CGL policies contained a pollution exclusion, barring coverage for claims of damage from the release of pollutants unless the release was “sudden and accidental.” Beginning with 1986, the CGL policies contained apollution exclusion without the “sudden and accidental" exception.
For the years 1986 through 1989, Nashua also purchased from Liberty Pollution Liability (known as “PL") policies. These policies provided that Liberty would indemnify Nashua for any sums that Nashua “shall become legally obligated to pay” as a result of “property damage . . . caused by a pollution incident which commences subsequent to” January 1, 1986, subject to certain definitions and exclusions, provided that the claim is first made against Nashua during the policy period, and is reported by Nashua to liberty within a specified time. The PL policies also provided that Liberty would defend Nashua against any “suit ... on account of such . . . property damage.”
1. The Des Moines Barrel and Drum Site
For a period of time that is in dispute, Nashua regularly sold drums that had been used for hazardous materials to a drum recycling facility in Des Moines, Iowa. On February 19, 1992, the United States Environmental Protection Agency (“EPA”) notified Nashua by letter that it was a Potentially Responsible Party (“PRP") under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq. (“CERCLA”), for contamination at the site of the Des Moines drum recycling facility. On April 21, 1992, Nashua notified Liberty of the EPA’s claims and requested defense and indemnification. On June 4, 1992, the EPA sent Nashua a Unilateral Administrative Order (“UAO”) directing Nashua to undertake specified remedial actions at the Des Moines site. On June 19,1992, Liberty notified Nashua of its denial of coverage.
2. The Norton Site
In 1974, Nashua purchased a manufacturing plant in Watervliet, New York, from the Norton Company, which had previously conducted manufacturing operations there. Norton, like Nashua, was an insured of Liberty. On August 31, 1989, the EPA notified Nashua that it was alleged to be liable under CERCLA for contamination at the site, particularly sewer contamination. By letter dated October 10, 1989, Nashua notified Liberty of the EPA’s claim and requested defense and indemnification. Receiving no immediate response from Liberty, Nashua undertook its own response to the EPA. As part of its response strategy, in December of 1990 Nashua filed suit against tibe Norton Company in the United States District Court for the Northern District of New York, seeking a declaration that Norton was obligated to indemnify it for the cost of whatever remedial action the EPA might require. Norton counterclaimed against Nashua in January of 1991, and also joined Liberty, seeking to compel Liberty to defend Norton under policies Norton had purchased from Liberty. Norton prevailed against Liberty, and Liberty then undertook the defense of Norton in Nashua’s suit against it; Nashua continued to press Liberty for defense, including both the prosecution of its action against Norton and the defense of Norton’s counterclaims. After various communications between Nashua and Liberty, in May of 1993, Liberty notified Nashua that it considered some, but not all of the claims covered, and would defend only if Nashua agreed to certain limitations and conditions on its defense. Nashua declined.
On October 17, 1994, Nashua brought this action against Liberty. Nashua’s complaint seeks a declaration that Liberty is obligated to defend and indemnify Nashua with respect to all claims involving both the Des Moines Barrel and Drum site and the Norton site.[1] The complaint also seeks damages for breach of contract and violation of G.L.c. 93A, §11.
DISCUSSION
1. The Standard for Summary Judgment
This court grants summary judgment where the record establishes that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the nonmoving party’s case, or by *435 showing that the nonmoving party is unlikely to submit proof of that element at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The nonmoving party cannot defeat the motion by resting on its “pleadings and mere assertions of disputed facts . . .” LaLonde v. Eissner, 405 Mass. 207, 209 (1989). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson v. Time, Inc., 404 Mass. at 17. “A complete failure of proof concerning an essential element of the nonmoving party’s case renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. at 711, citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
2. The Duty to Defend
The basic rule regarding an insurer’s duty to defend under a contract of liability insurance is set forth in Sterilite Corporation v. Continental Casualty, 17 Mass.App.Ct. 316, 318 (1983). The Appeals Court said there:
. . . [T]he question of the initial duly of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are “reasonably susceptible” of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense . . . [T]he process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.
(Citations omitted.) The Supreme Judicial Court adopted this standard, citing Sterilite with approval, in Continental Casualty Co. v. Gilbane Building Co., 391 Mass. 143, 146-47 (1984), and has applied it in the environmental context. E.g. SCA Services, Inc. v. Transportation Insurance Co., 419 Mass. 528, 531-32 (1995); Liberty Mutual Insurance Co. v. SCA Services, Inc., 412 Mass. 330, 331-32 (1992).
Thus, the duty to defend depends not on the actual facts of the event giving rise to the liability, but on the full range of possible facts that could fall within the scope of the allegations of the third-party’s complaint.[2] Of course, in light of modern pleading practices, a complaint may be so general as to encompass a wide range of possible factual scenarios, some of which would and some of which would not fall within the scope of insurance coverage. In such an instance, the "possibility that the liability falls within the insurance coverage” is enough to trigger the duty to defend. Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. at 319. Only where “the allegations of the complaint describe with precision” events which “the insurance policy expressly excludes from coverage” is the insurer free to refuse a defense. Terrio v. McDonough, 16 Mass.App.Ct. 163, 168 (1983).
Even if the complaint does not appear to fall within the policy, the insurer may have a duly to defend if additional facts, known or available to it, indicate that the claim is covered. E.g., Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989) (insurer required to defend under defamation liability policy where complaint on its face alleged only breach of contract, but additional facts known to insurer indicated plaintiff alleged harm to reputation); HDH Corporation v. Atlantic Charter Ins. Co., 41 Mass.App.Ct. 131, 135(1996) (worker’s compensation insurer obliged to defend based on its knowledge that plaintiff was insured’s employee, although complaint did not so allege). The converse, however, is not the case; where a complaint on its face is susceptible of a reading that brings the claim within the policy, the insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend. Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. at 323. Its remedy in such a situation is to bring an action for declaratory judgment, in which it can seek to establish that the facts of the underlying claim are such as to preclude coverage. Id. at 323. In such an action, the insurer generally must name the third-party claimant as well as the insured, so that the third-party claimant will be bound by the adjudication, and the insured will be protected from the possibility of inconsistent adjudications. Id. Pending the outcome of that action, the insurer must defend the underlying claim. Id.
In Lumberman’s Mutual Casualty Co. v. Belleville Industries, Inc., 407 Mass. 675, 686 (1990), the Supreme Judicial Court expressed approval of Sterilite’s rulings on this point, but observed:
We do not discount the possibility of an action solely between an insurer and an insured concerning the insurer’s duty to defend, where the complaint in the underlying action is so general as to allege a claim arguably falling within the coverage of the policy, but it is apparent from the event that the loss is not covered by the insurance policy . . . Although a determination that the insurer had no duty in those circumstances would not foreclose such a duty if the facts of the underlying claim changed, or if the complaint were amended, that determination would relieve the insurer of a current duty to defend based on then-current circumstances.
(Citation omitted.)
Here, Liberty declined to defend without bringing any action to establish the absence of a duty. It was Nashua that brought this action, seeking to compel Liberty to defend. Moreover, the third-party claimants are not parties to this case and will not be bound by any declaration entered here regarding the nature of *436 their claims or the underlying facts. In this context, the principles discussed supra dictate that Liberty’s duly, at least up to the time when this case concludes, be considered based on the third-party complaints, read broadly. To the extent that additional information is known or available, that information may serve to broaden interpretation of the third-party complaints, so as to bring them within the scope of coverage under the policies even if they would not otherwise be; it may not, however, provide a basis for reading the claims more narrowly than they would otherwise support, so as to exclude coverage.[3]
3. The Des Moines Barrel and Drum Site
The EPA’s first letter to Nashua, dated February 19, 1992, informed Nashua that the “EPA believes that your company sent drums” to the site, because EPA investigators had “found at least one drum at the site which appears to have come from your company and to contain a hazardous substance. That drum can be described as follows: Markings on a 55 gallon 17E M drum: Nashua Corp, Omaha, NE, Piccovar Resin; Flammable Liquid.” Based on this information, the EPA informed Nashua that it was a PRP, which might be obligated, along with other PRP’s, to implement response actions and to pay for the EPA’s response actions. Nashua notified Liberty of the EPA’s claim in a letter dated April 21, 1992, stating that: “This letter is to put you on notice of a potential claim under our insurance policy or policies with you for the policy years between 1976 through 1980 and/or policy year 1986 .. . Our records indicate that we shipped ‘empty’ drums to this site during the years 1976 through 1980 and in 1986.”
The EPA’s second written communication to Nashua, its UAO of June 4, 1992, contained the EPA’s findings of fact, including that the facility at the site had been operated by a series of owners between approximately 1945 and approximately 1992; that Nashua had “sent numerous drums to the site,” some of which contained specified hazardous materials; that the facility’s operations had generated waste streams containing a list of hazardous materials; and that soil and groundwater in and around the site were contaminated. Based on these findings of fact, the EPA concluded that Nashua, along with others, was liable for necessary response actions, and ordered Nashua and the other respondents to perform specified work and to pay EPA’s costs.
Nashua contends that Liberty is obligated to defend it against these claims under one or more of its CGL policies.[4] Liberty responds that none of the policies applies because: (1) Nashua’s liability does not result from an “occurrence,” within the meaning of the policies; (2) the pre-1971 policies are inapplicable for the additional reason that Nashua’s shipments to the site began after those policy years; and (3) the policies for the years 1971 and later are inapplicable for the additional reason that the EPA’s notices do not allege facts bringing the claims within the “sudden and accidental” exception to the pollution exclusion. If the latter two contentions are correct, then the “occurrence” issue is of no consequence and need not be considered.
a. The Pre-1971 Policies
Liberty argues that it has no duty to defend under policies prior to 1971, the year it began including pollution exclusion language, because Nashua made no shipments to the site during those years, so that Nashua’s liability cannot have arisen from events during those years. Liberty relies on Nashua’s response to the EPA, in which Nashua dated its shipments as having occurred from 1976 to 1980 and in 1986, as well as on records of the site operators, produced in the EPA administrative proceeding, reflecting shipments from Nashua in those same years. In response Nashua points out that the EPA’s conclusions rest on the operation of the site beginning in 1945, and that the EPA’s finding of liability against Nashua subjects it to joint and several liability for the entire cost of the clean up, regardless of the timing of its own contribution. Nashua further relies on deposition testimony of Wayne C. Prieast, who operated the site from 1945 to 1977, to the effect that Nashua had sent drums to the site over the course of his last ten years there — that is, 1967 to 1977. Liberty protests the use of this deposition testimony on the grounds that it had no notice of the deposition, was not a party to the proceeding in which it occurred, had no right to attend and cross-examine, and did not do so.
Under the principles set forth above regarding the standard for determining a duty to defend, the facts Liberty cites, deriving as they do from sources outside the EPA’s notices, have no bearing on the determination presently before the Court. It is those notices, not the underlying facts of the claims, that govern the duty to defend, except insofar as the underlying facts, known or available to Liberty, might tend to show coverage that would not otherwise appear from the notices. The EPA notices, as Nashua points out, do not limit EPA’s assertion of liability against Nashua to events that occurred after any specified date later than 1945. For this reason, the Court need not resolve the debate between the parties regarding the admissibility of the Prieast affidavit against Liberty.
Nashua’s claim with respect to pre-1971 policies fails for another reason, however. Nashua’s notice to Liberty regarding the EPA claims, in its April 21, 1992 letter, claimed coverage only under policies “for the policy years between 1976 and 1980 and/or policy year 1986." Under the policies, Nashua was obligated to give Liberty written notice of any “occurrence,” as well as to forward any demand, notice, summons, or other process received. It is not apparent from the policy language whether this obligation extended to identifying the particular policies under which Nashua claimed coverage, and the parties have not addressed *437 that issue, but in this instance Nashua did so, and Liberty’s response denying coverage was based on that notice. Nashua has not identified any other writing, prior to the filing of this case, in which it claimed coverage for the Des Moines site under earlier policies. Having limited its claim for coverage to policies for 1976 and later years, Nashua cannot now be heard to argue that Liberty violated its obligations by failing to defend under policies dated before 1971. See Employers Insurance of Wausau v. George, 41 Mass.App.Ct. 719, 723 n.11 (1996) (insureds’ failure to inform insurer of claimed right to defense based on EPA letters cited as one ground, among others, for rejection of insureds’ claim).
b. The Policies for 1971 and After
From 1971[5] through 1985,[6] the CGL policies contained pollution exclusion provisions, with an exception for “sudden and accidental” occurrences. Thus, Liberty could be required to defend Nashua against the EPA claims only if contamination resulting from one or more “sudden and accidental” releases would be within the range of the allegations in the EPA notices. See Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. at 322. Liberty argues that it would not. It relies on the absence of any language in the EPA notices describing the contamination as resulting from any sudden and accidental release, or identifying any sudden event causing a release, and on the purported fact, drawn from sources in the administrative record, that the Des Moines facility “regularly and routinely discharged hazardous wastes.”
The problem with Liberty’s position, here again, is that, in light of its unilateral denial of coverage, evaluation of its duty to defend is limited to the allegations of the EPA’s notices. Facts revealed in the course of the administrative proceedings regarding how the releases actually occurred cannot relieve it of its duty, if the EPA notices are broad enough to encompass releases that would fall within the exception to the exclusion. In this respect, this case differs from Employers Insurance of Wausau v. George, 41 Mass.App.Ct. at 722-23, where the insurer had brought a declaratory judgment action, putting in issue the actual facts of the underlying claims. Nor does the absence of an express allegation of “sudden and accidental” determine the duty to defend. The EPA would have no reason to include any such allegation, even if it believed that releases occurred in precisely that manner; its concern is not the manner of release, but the resulting contamination.
The question, then, is whether the facts set forth in the EPA notices leave open the possibility that the contamination resulted from releases that were “sudden and accidental.” The Supreme Judicial Court has construed that phrase as having a “temporal quality." Lumberman’s Mutual Casualty Co. v. Belleville Industries, Inc., 407 Mass. at 680. It does not follow that contamination at a facility that is in the business of handling and disposing of hazardous materials can never be the result of a “sudden and accidental” release; sudden and accidental events can occur even within the context of such an operation. See Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 203 (1995) (summary judgment inappropriate where insured offered evidence that sudden and accidental release caused contamination, despite inherently hazardous nature of business). But where the underlying complaint “asserts contamination of the site and the surrounding area and waters due to continuous waste disposal practices occurring over a protracted period of time as a concomitant part of a regular business activity,” it cannot reasonably be read as including sudden and accidental releases within its scope. Liberty Mutual Ins. Co. v. SCA Services, Inc., 412 Mass. at 336; Landauer, Inc. v. Liberty Mutual Insurance Co., 36 Mass.App.Ct. 177, 181 (1994).
Here, the facts contained in the EPA’s notices regarding the releases are not as specific as those discussed in Liberty Mutual and Landauer. The EPA’s UAO does, however, include factual findings which, fairly read, present a version of events characterized by regular and continuing discharges in the course of routine operations, along with conditions constituting a threat of discharge, rather than one or more discrete, sudden incidents. Paragraph 30 of the EPA’s order asserts that the “operations” of the facility “generated waste streams” containing lead and other specified materials; that “lead found in the wastes generated by the operation of the baghouse" failed toxicity analysis; that lead found in a single identified drum also failed analysis; and that “a sample of the incinerator ash” also failed analysis. Paragraph 35 sets forth the EPA’s finding of the existence of “ignitable waste streams” in tanks, vats, and a sump on the site, including “liquid from the drum rinse tank” and samples taken from drums on the site. The EPA’s order does not purport to describe how these conditions came to exist, but it seems at least far-fetched to read the order as describing conditions resulting from any sudden event, as opposed to the routine operation of the facility.
Nashua points to paragraph 36 of the EPA’s order, which states that “(i]n 1984 there were two fires on the site resulting from the proximity of ignitable waste to the incinerator.” Releases resulting from fires can be sudden and accidental. E.g. Nashua Corp. v. First State Ins. Co., 420 Mass. at 203 (release from fire and explosion would be sudden and accidental). In context, however, the quoted sentence does not appear to assert that the fires were the cause of releases resulting in the contamination that is the subject of the order. The next sentence of the paragraph goes on to state that drums containing flammable waste are present in the “main processing area" of the site, and that “a fire at the site could generate smoke and fumes that would expose" nearby residents. Thus, in context the reference to fires seems directed at identifying a *438 risk of future harm that is present in the conditions existing at the site.
As Nashua argues, the EPA’s notices do not unequivocally foreclose the possibility that some part of the contamination may have resulted from some sudden and accidental event. The standard, however, is not that extreme. Rather, the Court’s task is to consider what allegations are fairly within a reasonable reading of the EPA’s notices. Liberty Mutual Insurance Co. v. SCA Services, Inc., 412 Mass. at 336-38. This Court concludes that a reasonable reading of the EPA’s notices to Nashua regarding the Des Moines Drum and Barrel site does not include a claim of contamination resulting from a sudden and accidental release of pollutants. Accordingly, Liberty is not obligated to defend under the policies containing the pollution exclusion.
4. The Norton Site
The EPA’s first notice to Nashua regarding the Norton site, dated August 31, 1989, was on a form with blanks filled in. The form states that “The release and/or threatened release noticed herein, has occurred on (Date)....” The date filled in was “8/31/89.”[7] The form identified the location of the release as the address of Nashua’s Watervliet plant. In the blank for “consists of (Description of Incident),” the words “sewer contamination on property” were filled in. Nashua sent a copy of the notice to Liberty, along with a letter dated October 10, 1989, informing Liberty that “the engineering firm retained to conduct a preliminary review of the site has indicated there may be damage from migrating chemicals to neighboring properties.”
On December 14, 1990, Nashua sued Norton in the United States District Court for the Northern District of New York. Nashua’s complaint alleged that the site was contaminated by leaks from underground piping installed and used by Norton, that leaks had occurred and were known to Norton by 1969,[8] and that Norton knew of the resulting contamination and did not disclose it to Nashua in connection with Nashua’s purchase of the property. Nashua also alleged that in July 1989, Norton employees had released hazardous chemicals on a part of the site that Norton still operated under lease from Nashua. Based on these allegations, Nashua claimed that Norton was liable for Nashua’s response costs.
On January 25, 1991, Norton filed its answer and counterclaim. Norton denied liability to Nashua, and alleged in substance that it had fully remedied all leaks by 1970, so that no contamination remained at that time. Norton further alleged that in purchasing the site Nashua had agreed to assume all of Norton’s “obligations” under all laws “relating to the operations," and that Nashua knew of the earlier leak when it purchased the site. In addition, Norton alleged that in operating the site after 1974 Nashua had discharged hazardous chemicals into the sewer system, onto the ground, and into the air, with air omissions possibly having been converted back into liquid form through rain. Documents produced in discovery in the litigation between Nashua and Norton, and provided to Liberty in December 1992, indicate that at least one of the discharges alleged to have occurred at the site since Nashua purchased it was a spill of 1,288 gallons of toluene on September 3, 1986, reported by Nashua to the state environmental agency as having resulted from equipment failure. Based on these allegations, Norton claimed that Nashua is liable to it for its response costs.[9]
Nashua claims that Liberty is obligated to defend it against both the EPA and Norton, and that such defense includes the prosecution of its suit against Norton, which seeks to shift to Norton the liability the EPA seeks to impose on Nashua. Nashua claims coverage under the CGL policies for all years, and under the PL policy for 1989. Liberty contends that none of the policies provides coverage. It argues that: (1) none of the events alleged was an “occurrence” within the meaning of the CGL policies; (2) Nashua did not own the site until 1974, and accordingly is barred from coverage under pre-1974 CGL policies by the “pre-acquisition coverage doctrine”; (3) the CGL policies for 1974 and later years do not provide coverage because of the “known loss” doctrine, and also because of the pollution exclusions in those policies; (4) the 1989 PL policy does not apply because the contamination did not commence after January 1, 1986; and (5) coverage is barred under all the policies because of the “owned property exclusion.” If the last two of these five contentions both fail, then Liberty must defend under the 1989 PL policy, regardless of its first three arguments, all of which relate to the CGL policies. The Court will therefore begin with Liberty’s two arguments regarding the PL policy.
a. Owned Property Exclusion
Both the CGL and the PL policies exclude coverage for damage to “property owned or occupied or rented to the insured.” Pointing to the EPA notice of “sewer contamination on property,” Liberty argues that the only property damage claimed is to Nashua’s own property, and is therefore excluded. Nashua responds, citing federal cases and a series of Superior Court decisions, that contamination posing a risk of migration beyond the insured’s own property is not excluded, because exclusion of such contamination would only result in more widespread harm and more costly claims thereafter. E.g., Allstate Ins. Co. v. Quinn Construction Co., 713 F.Supp. 35, 40-41 (D.Mass. 1989). Liberty appears to concede that a threat of off-site migration would avoid the exclusion. The question, then, is whether “sewer contamination on property” is reasonably susceptible of an interpretation that includes migration, or a risk of migration, off the site. Both sides point to expert opinions generated in the underlying proceedings. Because the issue must *439 be decided based on the claims themselves, this evidence does not help to resolve the question. The Court must therefore rely on the basic nature of sewers, as systems for transporting waste from its source to a location where it may be disposed of safely. In the absence of any indication that the sewer system involved here did not fit that description, this Court concludes that the EPA’s assertion of sewer contamination implicitly alleged actual or threatened migration of the contamination beyond the boundaries of Nashua’s property, notwithstanding the phrase “on property.”
b. The PL Policy
Nashua contends that Liberty is obligated to defend it under the 1989 PL policy, as well as under the CGL policies. Liberty concedes that the PL policy had no “occurrence” requirement and no pollution exclusion, and would not be subject to either the pre-acquisition coverage doctrine or the known loss exclusion. Thus, if the PL policy applies, then Liberty must defend without regard to those issues.
The PL policy by its terms covers liability for any “pollution incident” that commenced after January 1, 1986. “Pollution incident” is defined as “the entirety of’ any “emission, discharge, release, or escape of. . . pollutants directly from an insured site . . . into or upon land, the atmosphere, or any water course or body of water provided that such emission, discharge, release or escape results in environmental damage.” Environmental damage is defined as the “injurious presence” of pollutants “in or upon land, the atmosphere, or any watercourse or body of water.”
Liberty argues that the claims involving the Norton site do not allege any such pollution incident after the crucial date. It bases this argument on materials filed by Nashua in its litigation with Norton, in which Nashua takes the position that the contamination resulted solely from the leaks in the underground piping system that occurred in 1968-69, and not from any later releases. The problem with this theory, as with Liberty’s earlier arguments, is that it relies on the insured’s defense to the third-party claims, rather than to the claims themselves. As discussed supra, the duty to defend must be decided based on the claims as alleged, not the actual facts of the events giving rise to the liability, and still less on factual contentions of the insured that the underlying claimants dispute.
The EPA’s notice, described supra, alleges simply sewer contamination. The only date given is that of the notice itself, August 31, 1989. The notice does not purport to state how or when the contamination occurred. For all the notice tells, it may have resulted from a single release or many; such release or releases may have been sudden or gradual; and it or they may have occurred at any time up to and including the date of the notice.[10] The Norton counterclaims are somewhat more specific, but their specificity tends to support Nashua’s claim of coverage. Norton alleges repeated discharges on unspecified dates after Nashua’s purchase of the property in 1974. Nothing in the counterclaims precludes the possibility that one or more of those alleged discharges commenced after January 1, 1986, and in fact, as noted supra, discovery has identified one of those alleged discharges as a spill that occurred on September 3, 1986. It is thus clear that both the EPA notice and the Norton counterclaims, reasonably read, include at least the possibility that one or more discreet releases commencing after January 1, 1986 caused or contributed to the contamination. Accordingly, Liberty is obligated to defend Nashua under the 1989 PL policy.
This leaves the question of the scope of the defense. It is clear, and Liberty does not dispute, ttiat a duty to defend arising from a particular claim or count of a complaint compels the insurer to defend the insured against the entire complaint. Aetna Casualty & Surety Co. v. Continental Casualty Co., 413 Mass. 730, 732 n.1 (1992) (noting that although Massachusetts has not yet definitively addressed the issue, the weight of authority requires an insurer to defend an entire suit); Safeguard Scientists, Inc. v. Liberty Mutual Ins. Co., 766 F.Supp. 324, 329 (E.D. Pa. 191), aff'd in relevant part, 962 F.2d 209 (3d Cir. 1992). There is thus no doubt that Liberty must defend Nashua both against the EPA and against Norton’s counterclaims.[11]
What is less clear is whether Liberty’s defense obligation extends to Nashua’s prosecution of its claims against Norton — the same claims Liberty is already defending on Norton’s behalf, under court order. Nashua argues that its only purpose in suing Norton was to protect itself from liability to the EPA and the New York state environmental agency, so that its suit against Norton was inextricably intertwined with its defense to the governmental claims. It relies on federal cases applying insurers’ duty to defend to counterclaims and cross claims in comparable circumstances. E.g., Oscar W. Larson Co. v. United Capitol Ins. Co., 845 F.Supp. 458, 460-61 (W.D. Mich. 1993); Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co., 766 F.Supp. at 333-34. Liberty responds that Nashua’s suit against Norton was a voluntary undertaking by Nashua, rather than an obligatory defense to claims against it. It cites Sarnafil, Inc. v. Peerless Ins. Co., 34 Mass.App.Ct. 248, 252-53 (1993), in which the Appeals Court held that the voluntariness of the insured’s initiation of arbitration, for a “purpose other than defending a claim covered by the policies” under a policy that barred the insured from voluntarily incurring any expense, precluded reimbursement. Id. at 253.
This Court concludes that the Norton suit is covered, for the same reasons the federal courts held the cross claims and counterclaims covered in the cases cited. Nashua’s complaint against Norton, on its face, seeks to hold Norton responsible for the veiy same *440 contamination that the EPA had alleged against Nashua. If the EPA had sued both Nashua and Norton, rather than sending PRP notices to each of them, Nashua’s claims against Norton would properly have been raised in the form of a cross claim. In the context of the EPA’s administrative process, however, no mechanism exists for the assertion of cross claims among PRP’s; a party in Nashua’s position can attempt to transfer its liability to another PRP only by filing a separate suit, as Nashua did here. Thus, Nashua’s suit against Norton is the functional equivalent of a cross claim, and merits coverage under Liberty’s duty to defend, just as a cross claim raising the same allegations would if the two companies were co-defendants.
3. The Duty to Indemnify
Liberty has moved for partial summary judgment declaring that it has no duty to indemnify Nashua with respect to the Des Moines and Norton sites, as well as no duty to defend. Nashua’s response is that the motion is premature, in that it has yet to conduct sufficient discovery to make a full factual presentation of the underlying facts of the claims as to those sites, on which the duty to indemnify will depend. Nashua has filed an affidavit under Mass.R.Civ.P. 56(f) specifying the discovery it needs to complete before being able to make a full response to Liberty’s motion.
The present cross motions were prepared in the fall and winter of 1995-96, and filed on April 3, 1996. In the months since, discovery may have occurred, or the underlying proceedings may have advanced, so as to materially alter the posture of the indemnification issue. Accordingly, the Court will take no action at this time as to that issue, and will leave it to the parties to present the issue in the form of a new or renewed motion, in light of the rulings in this memorandum and whatever factual development has occurred since the filing of these motions.
4. The Motions to Strike
Liberty has moved to strike (1) the affidavit of Michael D. Hockley, with appended excerpts from the deposition of Wayne Prieast, regarding the timing of Nashua’s shipments to the Des Moines Barrel and Drum site; and (2) portions of the Affidavit of William Bonneville, regarding the terms of certain lost policies. Nashua has moved to strike certain exhibits to the affidavit of Liberty’s counsel, Janice Kelly Rowen, consisting of certain expert reports regarding evaluations and investigations of certain of the sites.
For the reasons stated supra, the Court has found it unnecessary to consider the Prieast affidavit or the terms of the lost policies in ruling on the issues presented with respect to the duty to defend. Accordingly, there is no need for action on Liberty’s two motions to strike. As to the exhibits to the Rowan affidavit, all but one relate to the two Connecticut sites, as to which the parties have informed the Court that they have reached agreement, and have withdrawn their motions. Accordingly, the Court treats Nashua’s motion to strike as withdrawn insofar as it applies to those materials. The remaining exhibit raised in Nashua’s motion to strike is a report of an environmental consultant, hired by Nashua, relating to the consultant’s investigation of the Norton site. Liberty offers the report to show the the actual facts at the Norton site, as well as Nashua’s reliance on those facts in seeking to shift liability to Norton. As indicated supra, those facts are immaterial to determination of the duty to defend. Accordingly, no action is necessary on Nashua’s motion to strike.
ORDER
For the reasons stated, it is hereby ORDERED as follows: Nashua Corporation’s Motion for Partial Summary Judgment is DENIED with respect to the Des Moines Barrel and Drum site, and ALLOWED with respect to the Norton site. The Cross-Motion of Liberty Mutual Insurance Company for Partial Summary Judgment Against Nashua Corporation is ALLOWED with respect to the duty to defend as to the Des Moines Barrel and Drum Site, and DENIED with respect to the duty to defend as to the Norton site. The Court takes no action on that motion with respect to the duty to indemnify. The Court also takes no action on the Motion of Defendant Liberty Mutual Insurance Company to Strike Affidavit of Michael D. Hockley and Exhibits Submitted Therewith, the Motion of Defendant Liberty Mutual Insurance Company to Strike Paragraphs 6 and 7 of Affidavit of William Bonneville, and the Motion of Nashua Corporation to Strike Certain Exhibits to the Affidavit of Janice Kelley Rowan.

 The complaint also raises claims with respect to two other sites, the Old Southington Landfill site and the Solvents Recovery Site, both located in Southington, Connecticut. Nashua’s counsel informed the Court, by letter dated November 18, 1996, that the parties had reached agreement regarding the defense of claims relating to those two sites, and therefore had agreed to withdraw their motions for partial summary judgment with respect to those sites. Accordingly, this memorandum will not address those sites.

 For this purpose, notices and administrative orders from the EPA, such as those Nashua received, are the functional equivalent of a complaint. Hazen Paper Company v. United States Fidelity & Guaranty Co., 407 Mass. 689, 695-97 (1990).

 In this respect, for purposes of the standard summary judgment analysis, the only facts that are material are the policy provisions, the claims presented in the underlying complaints, and any additional facts that might bring those claims within the coverage of the policies; disputes as to the actual facts of the events giving rise to the claims are not material, and do not preclude summary judgment.

 Nashua does not argue that the PL policies for the years 1986 through 1989 apply.

 Nashua’s initial brief and supporting affidavit dates the initiation of the pollution exclusion as 1974. In its reply brief, however, Nashua appears to concede that the policies included the exclusion beginning in 1971, as Liberty’s affidavit indicates. In light of the discussion in the previous section, the difference is not material.

 As noted supra, the 1986 and subsequent CGL policies contained absolute pollution exclusion provisions.

 Apparently the EPA sent a similar notice to Norton at or about the same time.

 Both Nashua and Norton have pointed to records showing that leaks from the underground piping in 1969 were so extensive as to cause the deaths of two sewer workers from toxic fumes. Liberty, as Norton’s insurer, defended and indemnified Norton from resulting claims.

 Both Norton and Nashua amended their pleadings in 1995. The changes do not appear to be material to this dispute.

 Read literally, the EPA notice indicates that the release or releases occurred on the date of the notice. Such a reading would be implausible, and neither party appears to read it that way.

 liberty points out that the Norton Counterclaims were made after Nashua’s coverage under the PL policy ended, and argues that they are excluded on that ground. The argument would have force if those claims sought recovery distinct from the response costs asserted by the EPA. The pleadings show, however, that Norton’s claims against Nashua, like Nashua’s against Norton, seek only to shift the burden of the same response costs asserted by the EPA. Thus, the entire Nashua — Norton litigation arises from the EPA’s claim, which was made during the period of the PL policy.