CONTINENTAL CASUALTY COMPANY vs. GILBANE BUILDING
COMPANY & another.[1]

Suffolk.  October 6, 1983. — February 13, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Insurance,* Insurer's obligation to defend, Construction of policy, Con-
tractor's insurance, Property damage. *Negligence,* Faulty design of
building. *Words,* "Property damage."

The property damage coverage of a comprehensive general liability insur-
ance policy included certain intangible damage which diminished the
value of property or rendered it useless.  [147-148]
In a civil action by a building owner against the contractor which alleg-
edly installed a defective "curtain wall" in the building, the com-
plaint, fairly read, encompassed consequential damage to the building
occurring after the curtain wall was installed and thus was sufficient
to bring into operation the liability insurer's obligation to defend the
action.  [148-149]
Where, in a civil action by the operator of a restaurant against the con-
struction contractor and a subcontractor on a nearby building from
which glass panels had fallen on numerous occasions, the complaint
sufficiently alleged economic harm to the restaurant resulting from
loss of public access to its premises, the liability insurer had the duty to
defend the action.  [149-150]
The "care, custody and control" exclusion clause in a policy of compre-
hensive general liability insurance was inapplicable in actions by the
owner of a building against the general contractor and a subcontractor
to recover for property damage resulting from the contractors' installa-
tion of a defective "curtain wall" in the building, where the com-
plaints, fairly read, alleged that the contractors turned over to the
owner a completed, but defective, building, rather than that the pre-
completion and postcompletion property damage resulted from a sin-
gle occurrence during construction.  [151-154]
Where the complaint in an action by the owner of a building against a
subcontractor could be read to allege that the building's "curtain wall"
was installed by the subcontractor in a manner causing injury to the
owner's tangible property, the loss alleged was not within the "injury

[1] H. H. Robertson Company.

to products" clause of a policy of comprehensive general liability insurance, excluding coverage of the curtain wall itself.  [154-155]

The "injury to work" exclusion in a policy of comprehensive general liability insurance covering construction of a building did not exclude coverage of consequential damage, such as loss of use, resulting from a subcontractor's defective design and installation of the building's "curtain wall," where the building owner's complaint in an action against the subcontractor fairly alleged that the curtain wall was integrated into the building when the damage occurred.  [155]

Where complaints by the owner of a building in actions against the contractor and a subcontractor for the building's construction could be read to allege failure of the building itself, as distinct from failure or threatened failure of any of its component parts, the "sistership exclusion" in the policy of comprehensive general liability insurance covering the construction had no application.  [155-156]

CIVIL ACTION commenced in the Superior Court on April 26, 1976.

The case was heard by *Adams, J.,* on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Thomas D. Burns (Charles Mark Furcolo & Steven H. Goldberg* with him) for the plaintiff.

*Anthony M. Feeherry (Cerise H. Lim Epstein* with him) for H. H. Robertson Company.

*Francis J. Sally* for Gilbane Building Company.

ABRAMS, J.  Continental Casualty Company (Continental) brought an action for a declaratory judgment against Gilbane Building Company (Gilbane) and H. H. Robertson Company (Robertson) to determine whether Continental had a duty to defend Gilbane and Robertson in actions brought by John Hancock Mutual Life Insurance Company (Hancock) and Mamma Leone's of Boston, Inc. (Mamma Leone), claiming damages from Gilbane and Robertson for the faulty design[2] of the John Hancock Tower (Tower).  A

---

[2] An action was also brought against I. M. Pei, the architect.  The judge ruled that the insurance policy specifically excluded the damages alleged in that action, and that Continental had no duty to defend Pei.  No appeal from that ruling is before us in this case.

judge of the Superior Court, on Continental's motion for a judgment on the pleadings or, in the alternative, for summary judgment, and on Robertson's cross motion for summary judgment, ruled against Continental and declared that Continental had a duty to defend Gilbane in the Mamma Leone action and Robertson in both actions. Continental appealed the judge's order for summary judgment and renewed its notice of appeal after judgment was entered in the Superior Court as to Robertson.[3] We granted Continental's application for direct appellate review. We affirm.

We summarize the facts.[4] In 1968, Hancock purchased two insurance policies from Continental pursuant to speci-

---

[3] The judge originally ruled that Continental had no duty to defend Gilbane in either action. Gilbane subsequently filed a motion to reconsider the summary judgment with respect to the Mamma Leone action, stating that exclusion (m) did not apply to Mamma Leone. The judge granted Gilbane's motion and held that Continental had a duty to defend Gilbane in the Mamma Leone action because the restaurant was not located in the Tower, which was Gilbane's work product, but was situated across the street in the John Hancock garage. Thus, the judge concluded exclusion (m) did not apply to the Mamma Leone action.

In its brief Gilbane does not contest the judge's determination on proceedings for summary judgment that Continental has no duty to defend Gilbane in the Hancock action. We deem Gilbane's failure to brief this issue as a waiver. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

With respect to the Mamma Leone action, Gilbane argues that because a final judgment was not entered in that case, Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977), appeal is not ripe. See *Tisei* v. *Building Inspector of Marlborough*, 5 Mass. App. Ct. 328, 330 (1977) (final judgment required before appeal). At oral argument, the parties informed us that the underlying actions have been settled, and that the only question remaining to be adjudicated is Continental's duty to defend Gilbane and Robertson. In these circumstances, we decline to remand this matter to the Superior Court for the entry of judgment in accordance with the judge's memorandum and then decide Continental's duty to defend Gilbane in a later appeal.

[4] We derive the facts from those found by the judge. In the court below, Gilbane contested the propriety of a summary judgment, arguing that there was a factual matter in dispute. The judge held that the case was ripe for summary judgment and, on appeal, Gilbane has not challenged that holding. Thus, we deem the matter waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

fications outlined in the construction contract for the Tower. The comprehensive general liability policy provided personal injury and property damage coverage for, among others, Hancock, the owner, Gilbane, the general contractor, and Robertson, the curtain wall subcontractor. At Hancock's insistence, the printed policy was amended to read: "The insurance afforded applies separately to each insured against whom claim is made or suit is brought."[5]

In 1975, Hancock sued Gilbane, Robertson, and others associated with the design and construction of the Tower curtain wall. In relevant part, the action alleged that in 1972 significant numbers of glass panels failed in the Tower's curtain wall. As a consequence, the Tower was not weathertight "and could not withstand the forces and conditions to which it was subjected." Hancock further alleged that the problem was the result of negligent design and construction by Gilbane and Robertson, and that Hancock sustained substantial damages, including "the deprivation of the use of the Tower, diminution in value of the Tower, and lost income on rentals for the Tower."

1. *The duty to defend.*[6] "It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense. See *Vappi & Co.* v. *Aetna Casualty & Sur. Co.*, 348 Mass. 427, 431

---

[5] Hancock also purchased an umbrella excess third-party liability policy to cover personal injury and property damage in excess of that covered by the primary insurance. Since we hold that Continental has a duty to defend under the comprehensive general liability policy, we do not reach or discuss the excess liability policy.

[6] The policy states that Continental "shall have the right and duty to defend any suit against the *insured* seeking damages on account of such . . . *property damage* . . . , even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

(1965); *Magoun* v. *Liberty Mut. Ins. Co.*, 346 Mass. 677, 681-682 (1964); *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 166 (1983). See also 7C J.A. Appleman, Insurance Law and Practice § 4683 (rev. ed. 1979); 14 M.H. Rhodes, Couch's Cyclopedia of Insurance Law § 51.42 (2d ed. rev. 1982); 1 R. Long, Liability Insurance § 5.03 (1981); A.D. Windt, Insurance Claims and Disputes § 4.01 (1982); Annot., 50 A.L.R.2d 458 (1956). Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy" (footnote omitted). *Sterilite Corp.* v. *Continental Casualty Co.*, 17 Mass. App. Ct. 316, 318 (1983). See *Terrio* v. *McDonough, supra* at 169. We turn to the allegations of the underlying complaints to determine whether they are or may be envisioned to be within the provisions of the policy.

2. *"Property damage" under the insurance policies.* Continental argues that the loss of use of property is not covered by the policy unless there is *physical* injury to tangible property. The comprehensive general liability policy defines property damage as "injury to or destruction of tangible property." See, e.g., *Hamilton Die Cast, Inc.* v. *United States Fidelity & Guar. Co.*, 508 F.2d 417, 419-420 (7th Cir. 1975). The judge ruled that because the complaints may be read to allege "both physical injury to and loss of use of the John Hancock Tower, the claims for damages result from 'property damage'" and were within the coverage of the policy. We agree.

We read the policy as written. We are not free to revise it or change the order of the words. "There is nothing in the definition [of property damage] requiring physical injury or destruction of property. The guide to determination of coverage is the kind of property rather than the kind of injury. Tangible property rendered useless is injured and hence is covered, since the definition of damages includes 'loss of use of property resulting from property damage.'" 3 R. Long, Liability Insurance App. B, § 6 (1981). We, like a major-

ity of courts considering this issue, conclude that "the term property damage does not require actual physical damage but can include intangible damage such as the diminution in value of tangible property." *McDowell-Wellman Eng'g Co. v. Hartford Accident & Indem. Co.*, 711 F.2d 521, 525-526 n.7 (3d Cir. 1983). See *Sola Basic Indus., Inc.* v. *United States Fidelity & Guar. Co.*, 90 Wis. 2d 641, 653-654 (1979); *Pittway Corp.* v. *American Motorists Ins. Co.*, 56 Ill. App. 3d 338, 342 (1977), and cases cited.

(a) *Hancock complaint.* The Hancock complaint alleges "substantial damages, including the cost of labor and materials for removing and replacing the glass units, additional design, engineering and construction costs, increased operating expenses and other costs for the Tower, the deprivation of the use of the Tower, diminution in value of the Tower, and lost income on rentals for the Tower." The complaint also alleges that the defects were not apparent until after the wall had been "completed and been subjected to normal forces and conditions." Further, the complaint suggests that Gilbane and Robertson fraudulently lulled Hancock into a false sense of security by assuring Hancock that the curtain wall would not fail once it "was completed and sealed" in the Tower.

Continental argues that the curtain wall was not integrated into the Tower,[7] and therefore damages were limited to the curtain wall itself and the cost of repair and replacement. Such damages are explicitly excluded from coverage by exclusion (1) and (m). See 151-155, *infra.* As we read the Hancock complaint, we think the allegations are "reasonably susceptible of an interpretation" that Hancock suffered its damages after the curtain wall was "completed and sealed" in the Tower. The allegations of damages are not limited to repair and replacement or intangible damages.

---

[7] On appeal, the parties differ as to whether the curtain wall was integrated into the Tower. None of the parties asks that we remand this matter to the Superior Court for resolution of this factual dispute. Because the complaint may be read to allege that the curtain wall was integrated into the Tower, we do not remand this matter on this issue.

They also encompass damage to the Tower itself after installation of the curtain wall.

Since the complaint may be read as claiming damages after integration of the defective curtain wall into the Tower, the allegations are sufficient to trigger the duty to defend. "[C]ommon sense dictates there was substantial property damage to the entire . . . building when the exterior walls presented a faded, discolored, mottled and unsightly appearance in contrast to a uniform and eye-pleasing manifestation envisioned by the original plans. To say the damage in such instance can be confined to the blocks as distinct from the . . . building, we feel, is unrealistic and loses sight of the forest because of the trees." *Dakota Block Co.* v. *Western Casualty & Sur. Co.*, 81 S.D. 213, 218 (1965). See *United States Fidelity & Guar. Co.* v. *American Ins. Co.*, 169 Ind. App. 1 (1976). See also *Beacon Textiles Corp.* v. *Employers Mut. Liab. Ins. Co.*, 355 Mass. 643, 646 (1969); *Sturges Mfg. Co.* v. *Utica Mut. Ins. Co.*, 37 N.Y.2d 69 (1975); *Lipton, Inc.* v. *Liberty Mut. Ins. Co.*, 34 N.Y.2d 356 (1974).[8]

(b) *Mamma Leone's complaint.* The judge, citing R. Long's treatise, found that Mamma Leone's complaint alleged property damage within the policy because "[t]angible property rendered useless is injured and hence is covered . . . . The discharge of noxious gas from the insured's plant renders a nearby business building unfit for human occupancy, the resulting loss of profits is covered." 3 R. Long, Liability Insurance App. B, § 6, 38-39 (1981). Accord: R. Elliot, The New Comprehensive General Liability Policy 12-6 (definition of property damage "omits any requirements that there be physical injury as a prerequisite for coverage. Thus, if tangible property is not physically damaged but is made useless by an act of an insured, the policy will cover the insured's legal liability assuming no specific exclusion

---

[8] The claim of "additional design, engineering and construction costs" also may be read to include correcting damage done by the failure of the curtain wall to parts of the Tower not worked on by Robertson.

applies. As an example: a large piece of contractor's equipment breaks down in a public street in such a manner that the street must be closed off for a period of time and the public has limited or no access to the stores located in the block affected. Loss of use claims from the operators of those stores would be covered").

Mamma Leone's allegations also are "reasonably susceptible of an interpretation" that the falling glass caused the area surrounding the restaurant to be cleared of pedestrians and roped off on numerous occasions. As a result of the falling glass, the public may not have been able to gain access to the premises. A "business may state a claim in nuisance for severe economic harm resulting from loss of access to its premises by its customers." *Stop & Shop Cos.* v. *Fisher*, 387 Mass. 889, 896 (1983).

In categorizing loss of access to property that results in severe economic harm, with physical damage to property with respect to a plaintiff's ability to sue in public nuisance, we implicitly recognized that "in cases where an established business may have been virtually destroyed," *Stop & Shop Cos.* v. *Fisher, supra* at 895, the business has suffered injury to its property. The Mamma Leone complaint envisions an interpretation that encompasses such a claim. Because our function simply is to decide whether Mamma Leone's allegations are "reasonably susceptible of the interpretation that they assert injury to property caused by accident and of a type not within the . . . [policy's] exclusion[s]," *Vappi & Co.* v. *Aetna Casualty & Sur. Co.*, 348 Mass. 427, 431 (1965), we conclude that the judge correctly determined that Continental had a duty to defend this action.

3. *Exclusions.* Continental argues that coverage for property damage is excluded by four clauses in the comprehensive liability policy. "Each exclusion is meant to be read with the insuring agreement, independently of every other exclusion." Tinker, Comprehensive General Liability Insurance — Perspective and Overview, 25 Fed'n Ins. Coun-

sel Q. 217, 223 (1975). We therefore consider each exclusion separately.[9]

(a) *Care, custody, or control exclusion.* Exclusion (i) of the comprehensive general liability policy excludes coverage of *"property damage* to property owned by the *Insured,* leased or rented equipment, or property *being installed, erected or worked upon by the insured,* his agents or subcontractors" (emphasis supplied). Continental argues that this exclusion applies because the property allegedly damaged in the Hancock complaint was "being installed, erected or worked upon by [Gilbane and Robertson], [their] agents or sub-contractors" at the time of the "occurrence" specified in the Hancock complaint. The crux of this argument is that the failure of the curtain wall constituted a single occurrence that commenced when Robertson was still working on the curtain wall.

In making this argument, Continental relies on the contractual definition of occurrence in the policy: "Occurrence means: (1) with respect to . . . *property damage,* an accident, including injurious exposure to conditions which results, during this policy period, in . . . property damage neither expected nor intended from the standpoint of the insured. All . . . *property damage* arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence." Continental concludes that the damage incurred during the later period was an extension of the initial breakage of the curtain wall and therefore is not within the policy. We do not agree.

---

[9] Continental states in its argument headings that the exclusions also apply to the Mamma Leone action. In its brief, however, Continental merely restates its position that property damage is not covered unless it results from *physical* injury to property not excluded. Continental thus argues that it has no duty to defend the Mamma Leone actions because the damages alleged therein do not in themselves constitute property damage under the policy and are consequential to damages excluded by policy exclusions. Because we hold that the allegation of loss of access to Mamma Leone's restaurant is, in itself, an allegation of injury to tangible property, this argument fails. None of the other exclusions has any other bearing on the Mamma Leone action.

"The time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *Bartholomew* v. *Insurance Co. of N. Am.*, 502 F. Supp. 246, 252 (D. R.I. 1980), aff'd sub nom. *Bartholomew* v. *Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir. 1981), quoting *United States Fidelity & Guar. Co.* v. *American Ins. Co.*, 169 Ind. App. 1, 7 (1976). As we read the Hancock complaint, its allegations are reasonably susceptible of an interpretation that Robertson and Gilbane turned over a completed but defective Tower, and that when the Tower malfunctioned, Hancock suffered property damage.

The Hancock complaint states that "[w]hen some of the glass units in the curtain wall failed during or shortly after installation, Robertson assured John Hancock that the failures were a result of normal problems incident to installation or were due to causes other than Robertson's negligent design, and would not continue once the entire curtain wall was completed and sealed. Robertson replaced glass units which failed during or shortly after installation." The Hancock complaint then claims that Robertson and Gilbane "fraudulently concealed from John Hancock the cause of the failures. Significant numbers of glass units did not fail until November, 1972." Hancock's complaint further alleges that "John Hancock has sustained substantial damages, including but not limited to the cost of labor and materials for removing and replacing the glass units in the curtain wall, additional design, engineering and construction costs, increased operating expenses and other costs for the Tower, the deprivation of the use of the Tower, diminution in value of the Tower, and lost income on rentals for the Tower."

The complaint is "reasonably susceptible" of the interpretation that stresses to which the curtain wall was subjected as part of the Tower differed significantly from the stresses which were placed on the individual glass panels during construction. Further, as we read the complaint, the repairs made while the Tower was still in the "custody and

control" of Gilbane and Robertson could have alleviated the conditions that led to the precompletion breakage. Thus, the complaint fairly read suggests an interpretation that precompletion and postcompletion property damage did not arise "out of continuous or repeated exposure to substantially the same conditions [so as to] be considered as arising out of one occurrence."

Continental argues additionally "[t]he only fair reading of exclusion (i) is to exclude from coverage all damage to property which was the subject of the insured's work." Before the insurance contract was signed, however, Hancock sought an explanation of exclusion (i) and Continental responded to Hancock's request by stating, "We . . . draw your attention to the severability of interests phraseology appearing under the persons insured section which confirms that 'the insurance afforded applies separately to each Insured against whom claim is made or suit is brought . . ., etc.' The question to ask is whether the Property damaged falls into the category of . . . property being installed, erected or worked upon by the Insured, his Agents or Subcontractors. In this case, the Insured is that entity against whom claim is being brought."

Hancock negotiated for and Continental agreed to the severability clause providing that each of the named insured be covered "as if separate policies . . . had been issued to each Insured hereunder." As we read its letter, Continental told Hancock that, although it was not providing builder's risk insurance under its third-party liability policies, the various named insured companies would be considered third parties with respect to each other under exclusion (i) unless the property allegedly damaged was *being* worked upon by the insured.

Exclusion (i) as written and exclusion (i) as Continental would have us read it are concerned with different actuarial problems. "[I]nsurance premiums are based upon risk-allocation, and the risk of damaging property handled in the course of work is greater than the risk of damaging other property." Mustachio, Manufacturers' and Contractors'

Liability Insurance Policy: The Care, Custody, or Control
Exclusion Clause, 6 Hous. L. Rev. 359, 359 (1968). Thus,
exclusion (i) as written excludes a high risk occurrence
(property *being* worked on) and provides a powerful incen-
tive for the insured to exercise optimum care with respect to
property being worked on and still within its care, custody
and control. Continental would transform exclusion (i) into
a sweeping exclusion of coverage for property damage to all
property on which the insured worked, even after comple-
tion. Such an interpretation contradicts the plain language
of the clause.

(b) *Injury to products exclusion.* Exclusion (1) of the gen-
eral liability policy excludes coverage "to property damage
to the named insured's products arising out of such products
or any part of such products." "[N]amed insured's prod-
ucts" is defined as "goods or products manufactured, sold,
handled or distributed by the named insured or by others
trading under his name, including any container thereof."

Continental does not contend that the whole Tower was
Robertson's "product."[10] According to Continental, how-
ever, the curtain wall was Robertson's product, and all
damage alleged by Hancock was a consequence of "property
damage to the named insured's products arising out of such
products." Continental's theory is that, if the insurance
does not cover damage to the curtain wall itself, it cannot
cover consequential damages resulting from failure of the
Tower after installation of the curtain wall. We have re-
jected Continental's definition of "property damage." *Supra*
at 148. Because the complaint suggests that the curtain wall

---

[10] The judge held that exclusion (1) did not apply to Gilbane or Robert-
son because neither defendant was a manufacturer or supplier of goods.
Relying on *Paxton-Mitchell Co.* v. *Royal Indem. Co.*, 279 Or. 607 (1977),
the judge stated that "'insured's products' refer to that in which the in-
sured trades or deals, and not all goods handled by an insured in the proc-
ess of completing its business function." Other courts have accepted this
interpretation. See *Gulf Miss. Marine Corp.* v. *George Engine Co.*, 697
F.2d 668, 672-673 (5th Cir. 1983). Because the Hancock complaint al-
leges damage to the Tower, we need not decide whether the curtain wall
was Robertson's "product" so as to invoke exclusion (1).

was integrated into the Tower in a manner causing "injury to . . . tangible property," we conclude that exclusion (1) does not relieve Continental of its duty to defend Robertson on the Hancock claim. See *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69 (1975).

(c) *Injury to work exclusion.* Exclusion (m) of the comprehensive general liability policy excludes coverage "to *property damage* to work performed by or on behalf of the *named insured* arising out of work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."[11]

In arguing that exclusion (m) should apply to property damage to the Tower as a whole, Continental makes the identical argument that it made with respect to exclusion (l) and the Mamma Leone claim, i.e., that the only actual physical injury to property alleged in either complaint was injury to the curtain wall, that such injury is excluded, and, therefore, that consequential damages such as loss of use do not constitute property damage under the insurance contract. We reject Continental's argument that, as a matter of law, we must hold that the curtain wall was not integrated into the Tower, and, therefore, there was no "injury to . . . tangible property." As we have said, the complaint fairly read suggests that the curtain wall was integrated into the Tower. See note 7, *supra.* Thus, Continental must defend Robertson with respect to the loss of use or diminution of value of the Tower. See *supra* at 147-148 (discussing "property damage") and *supra* at 154-155 (discussing exclusion [1]).

(d) *The "Sistership" exclusion.* Exclusion (n) of the comprehensive general liability policy excludes coverage for "*damages* claimed for the withdrawal, inspection, repair, replacement, or loss of use of the *named insured*'s products or work completed by or for the *named insured* or of any

---

[11] Robertson does not dispute the fact that it worked on the curtain wall and concedes that if Hancock exclusively alleged property damage to the curtain wall, rather than to the Tower, such claim would be excluded by exclusion (m).

property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein." Continental argues that the judge created an ambiguity in a clause that clearly excluded coverage and then construed the clause against the insurer. We disagree.

Exclusion (n) "is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. It is not, however, intended to exclude from coverage damages caused by the very product whose failure to perform properly aroused apprehension about the quality of 'sister' products. . . . Still less is it intended to exclude from coverage damages arising from the malfunctioning of a product where no 'sister' products are involved" (citations omitted). *Todd Shipyards Corp.* v. *Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir. 1982). 3 R. Long, Liability Insurance App. B, § 15 (1981); Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 445 (1971).

The complaints allege failure of the Tower itself; no sister products are involved. The Tower is unique, and thus exclusion (n) does not apply. This matter is remanded to the Superior Court where a judgment shall enter declaring that Continental has a duty to defend Gilbane in the Mamma Leone action and Robertson in both actions.

*So ordered.*