Toomey, J.
The Plaintiff, Northland Management Corporation (“Northland”), has filed suit against the defendant, Scottsdale Insurance Company (“Scottsdale”), for expenses Northland incurred in successfully defending a lawsuit arising out of its activities relating to the management of commercial real estate. Both sides contend that there are no genuine issues of material fact and each has moved for summary judgment. For the reasons discussed below, however, the cross-motions for summary judgment are DENIED.
BACKGROUND
The present lawsuit had its beginnings in a conflict between the Ohio Group, Incorporated (“Ohio Group”) and Northland. The Ohio Group was a commercial tenant occupying space in a shopping center owned by the Attleboro Pawtucket Savings Bank (“Attleboro”) and managed by Northland. The shopping center was located in Raynham.
On September 1, 1991, Scottsdale issued a policy of insurance covering Attleboro and naming Northland as an additional insured. Attleboro experienced financial reversals and, on August 22, 1992, the Federal Deposit Insurance Corporation (“FDIC”), serving as receiver for Attleboro, assumed control of Attleboro’s property including the Raynham shopping center.[1]
On April 22, 1994, the Ohio Group sued Northland for damage to the leased property, and the expensive equipment located therein, resulting from a leaking *492 roof. The Ohio Group alleged that it first observed leaks on the premises on September 27, 1990. It also claimed to have witnessed four other instances of leaks, each occurring during the coverage period of the Scottsdale policy.
Northland was defended in the Ohio Group suit by Kemper Insurance pursuant to a Comprehensive General Liability policy issued by Kemper to Northland. Sometime in the first few months of 1995 and during the course of its defense of Northland, counsel for Northland discovered the Attleboro policy, issued by Scottsdale, naming Northland as an insured for liability arising out of Northland’s property management activities on behalf of Attleboro. A provision in Northland’s Kemper policy limited Kemper’s exposure to excess liability only when other valid, collectible insurance existed for a given activity that occasioned liability claims against Northland. Thus, Northland looked to Scottsdale as its principal insurer with Kemper in an excess position. In March 1995, counsel for Northland wrote to Scottsdale, informing Scottsdale of the claims against Northland and of the opinion of Northland’s counsel that whatever liability North-land faced in the Ohio Group litigation was covered by the Scottsdale policy.
There is a dispute as to Scottsdale’s response to the March 1995 letter. Scottsdale insists that Scottsdale “immediately” requested a copy of the complaint filed by the Ohio Group so that it could ascertain its duty to defendant and indemnify Northland. Counsel for Northland concedes that there was indeed a phone conversation in May 1995 whereby Scottsdale “requested” copies of pertinent legal papers, but North-land recalls no assertion by Scottsdale that coverage of Northland would be contingent on Northland’s providing copies of the legal papers. Also during May 1995, a Scottsdale claims adjustor wrote to Northland’s counsel asking for a copy of the pleadings and other relevant documents to enable Scottsdale to determine its coverage obligations.
On September 22, 1995, Scottsdale wrote again to Northland’s defense counsel seeking to assess coverage and liability.[2] Scottsdale claims Northland “ignored” that request, while Northland responds that the request was misplaced. On or about February 29, 1996, Northland informed Scottsdale of the happy news that a verdict had been returned rejecting the Ohio Group’s claim and that judgment had entered in Northland’s favor. But, on a less cheerful note, North-land reported that it had incurred over $29,000 in legal expenses and costs.[3] On May 21, 1996, Scottsdale wrote to Northland denying coverage and refusing to reimburse Northland for Northland’s expenditures in defending the claims brought against it in the Ohio Group suit.
Northland filed the instant lawsuit against Scottsdale and the FDIC (successor to Attleboro) in order to recover the expenses it incurred in defending the Ohio Group’s claim. The FDIC settled with Northland, although no admission of FDIC liability was offered, and Northland dismissed the suit against the FDIC. In return, the FDIC assigned to Northland all claims it might have, as receiver for Attleboro, against Scottsdale.
Northland then amended its complaint, bringing Counts I through IV (relating to claims Northland asserts directly against Scottsdale upon the policy Scottsdale issued to Attleboro and Northland prior to the receivership) and Counts V through VIII (relating to claims Northland, as assignee of FDIC, makes against Scottsdale). The instant summary judgment conflict arises from that amended complaint.
DISCUSSION
Summary judgment will be granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). The moving party has the burden of affirmatively demonstrating that there is no genuine issue of material fact and that the summary judgment record entitles the moving party to judgment. Pederson v. Plymouth, 374 Mass. 206, 212 (1978).
At bar, both parties contend that there are no genuine issues of material fact. The court however, has recognized certain fact conflicts that render inappropriate disposition of the suit by summary judgment. The following recitation of litigable fact disputes is intended as illustrative of the incongruity of summary judgment on this record, and is not meant to preclude the parties from addressing other issues of material fact as the suit progresses.
Northland has filed suit against Scottsdale to recover expenses for a lawsuit filed against Northland by the Ohio Group. Northland contends it was an insured under a policy issued by Scottsdale to Attleboro and, at bottom, asserts two claims against Scottsdale: (1) breach of the insurance contract under which North-land was a named insured and (2) unfair and deceptive trade practices in violation of G.L.c. 93A.
Scottsdale asserts three basic defenses in its motion for summary judgment. First, and most frequently, Scottsdale argues that, because Northland’s defense counsel never forwarded copies of pleadings and other pertinent legal papers until judgment had entered in the Ohio Group litigation in February 1996, Northland can make no claims pursuant to the Scottsdale policy. Second, Scottsdale contends that all of Northland’s costs were paid by Kemper Insurance, and, accordingly, Northland has no damages resulting from the alleged breach by Scottsdale. Third, Scottsdale posits that, there being no evidence of any breach by Scottsdale injurious to Attleboro, or to the FDIC in its capacity as receiver, the assignment to Northland is inefficacious because Attleboro, and the succeeding FDIC, had nothing to assign.
*493 1. NORTHLAND’S BREACH OF CONTRACT CLAIMS
Scottsdale does not appear to dispute that there was a valid and enforceable contract between Kemper/Northland and Scottsdale at the time in question.[4] Northland claims Scottsdale breached the agreement and that Northland suffered damages as a result of the breach. Scottsdale replies that Northland’s failure to forward legal papers that would allow the insurer to assess coverage precludes North-land from later claiming any right to indemnification.
The duty of an insurer to defend is broader than its duty to indemnify. Continental Casualty Co. v. Gilbane Building Co., 391 Mass. 143, 146-47 (1984). The duty to defend is triggered whenever allegations within a complaint against the insured “state or adumbrate a claim covered by the policy terms.” Sterilite Corp. Continental Casualty Co., 17 Mass.App.Ct. 316, 318 (1983). Even where an insured is contractually obligated to notify an insurer of a filing against the insured, the resolution of certain factual issues might excuse the insured from the effects of deficiencies in its request of defense by the insurer. Sarnafil, Inc. v. Peerless Insurance Co., 418 Mass. 295, 302 (1994).
Scottsdale argues that the failure of Northland vigorously to demand its right to defense and participation by Scottsdale in the Ohio Group litigation resulted in a waiver of Northland’s right to Scottsdale’s services. Before waiver can be determined, however, there are factual questions about the pertinent contacts between Northland and Scottsdale that must be resolved. Northland’s counsel informed Scottsdale of the Ohio Group litigation, in a cursory fashion, in March 1995. Apparently, there was some informal contact between Northland’s counsel and Scottsdale thereafter, but no specifics of that contact are reflected by the record. There is likewise no evidence either that Northland insisted on Scottsdale’s providing a defense or that Scottsdale insisted on being provided more documentation.[5] The record before the court in connection with the present summary judgment motions does not suggest that either party was diligent, prior to judgment in the Ohio Group litigation, in determining the responsibility of Scottsdale for coverage. A finder of fact will need evidence to resolve the issue of whether or not diligence was lacking and, as a consequence, whether or not waiver is to be implied.
A lack of diligence, if any, by Northland’s counsel does not, however, end the matter. Before an insurer can be relieved of its responsibility to defend an insured based on the insured’s violation of the insurance provisions, the insurer must show it has incurred actual prejudice. Sarnafil, Inc. v. Peerless Insurance Co., 418 Mass. 295, 305 (1994). At bar. there are factual disputes over whether or not Scottsdale was denied an adequate opportunity to protect its interest, that is to say, whether or not Scottsdale incurred any damages because of the limited communication between counsel for Northland and Scottsdale. Because there was a defense verdict in favor of Northland, and no indemnification is, therefore, at issue, the only “damages” for which coverage is sought are the legal expenses incurred by Northland as a result of Kemper’s defending the lawsuit.
The payment of defense costs is exactly the sort of compensation that is contemplated by the policy at issue here. One of the reasons that an insured purchases insurance is to obtain assurance that, when defense of a lawsuit is necessary, such defense will be provided. Sarnafil, Inc. v. Peerless Insurance Co., 418 Mass. 295, 302 (1994). Even where an insurer makes a reservation of rights, the reservation does not excuse the insurer’s obligation to defend the insured while the insurer investigates to - determine whether coverage exists. Sarnafil, Inc. v. Peerless Insurance Co., 418 Mass. 295, 304 (1994). There remain accordingly, issues of material fact in connection with the prejudice, vel non, suffered by Scottsdale as a result of Northland’s alleged unreasonable silence.
There are further questions about the intensity of the investigation, if any, Scottsdale made after receiving notice of the litigation in March 1995. Scottsdale contends that Sarnafil does not support Northland’s position because, in Sarnafil, the insured met with the insurer to discuss the property damage within a month of the loss. Sarnafil, supra at 298. The Sarnafil record also reflected that the insured frequently communicated with the insurer and repeatedly sought an acknowledgment of coverage from the insurer. Id. at 299. While Northland does not appear to have as actively pressed its claims as did the insured in Sarnafil, neither does the record show much activity by Scottsdale in seeking to determine its exposure. The characterization that Scottsdale “repeatedly” sought information from Northland’s counsel is an exaggeration that finds little support in the record.
Therefore, the claims for breach of contract, which are, at the bottom, the essence of the litigation at bar, present genuine issues of material fact as to cooperate knowledge the quantum of investigation, if any, the insurer undertook after notification, and the prejudice, if any, to Scottsdale as a result of the alleged dilatory conduct of Northland’s counsel. Summary judgment on this record is, accordingly, inappropriate.
2. NORTHLAND’S CLAIMS OF UNFAIR TRADE PRACTICES
Northland also makes claims of fraudulent and deceptive trade practices in violation of G.L.c. 93A. Northland claims that Scottsdale’s response to Northland’s claims of coverage owed by Scottsdale in connection with the Ohio Group litigation were made in bad faith. In this insurance coverage dispute, North-land must show an absence of good faith and the presence of extortionate tactics in order to prove unfair settlement practices by the insurer. Guilty v. Commerce Insurance Co., 36 Mass.App.Ct. 339, 343 *494 (1994). An incorrect interpretation by the insurer of the relevant policy and consequent denial of coverage do not, without more, form the basis of a claim for unfair trade practices against an insurer. Boston Symphony Orchestra v. Commercial Union Insurance Co., 406 Mass. 7, 14-15 (1989).
At bar, Northland suggests that Scottsdale’s internal documents concerning Northland and the Ohio Group litigation demonstrate a predetermined, and thus unlawful, decision to deny coverage. The internal documents, according to Northland, show Scottsdale’s calculated resolve, before any adequate investigation of the claim was made, to deny coverage. Indeed, Northland argues, the documents even mention the possibility of offering a nominal amount to end the matter. Northland asserts that the evidence gives rise to an inference of bad faith on the part of Scottsdale and compels G.L.c. 93A liability.
The “evidence” upon which Northland relies is at best sketchy. The larger problem, however, is that most of the communications underlying Northlands’ G.L.c. 93A claim occurred at a time when Northland’s counsel had yet to provide Scottsdale with a copy of the complaint; the communications to that point likely reflected Scottsdale’s confusion and idle speculation rather than calculation and deception. The probative value of the communications and their support of Northland’s contention are quite remote, but such inferences are for the fact-finder, not for summary judgment.
3. NORTHLAND’S CLAIMS AS ASSIGNEE OF THE FDIC
Northland also claims the right to recover for FDIC’s claims against Scottsdale through an assignment of rights by the FDIC to Northland. Northland’s claims under the FDIC assignment is also somewhat nebulous because there is little or no information about what the FDIC’s claims against Scottsdale would likely be. The Ohio Group only sued Northland; it did not sue Attleboro — presumably because Attleboro had gone into FDIC receivership — and the Ohio Group did not sue the FDIC. Northland does point out that the Scottsdale policy had a provision stating that coverage would continue if Attleboro filed for bankruptcy, but neither party has addressed the issue of whether or not that provision should be read to assure coverage to an FDIC receivership. Further, the FDIC has had no external costs or damages from the underlying litigation or the present litigation. The FDIC’s only “damages” that might support a claim assignable to Northland would be limited to internal operating expenses. Such a claim is a tenuous one, given the predominating “American rule” that the parties must pay their own litigation expenses. Nevertheless, the present state of the record offers no occasion to engage in summary judgment upon Northlands’ claims as assignee from the FDIC.
ORDER
Based on the foregoing, it is hereby ORDERED that the cross motions for summary judgment be DENIED.

 Scottsdale claims its coverage ended on this date, but its insurance policy included a clause providing for coverage even if the insured filed for bankruptcy. The FDIC receivership may be distinguishable, but the issue is of no consequence because a significant portion of the water damage claimed by the Ohio Group was alleged to have occurred during the Scottsdale coverage period prior to the receivership, viz, from September 1991 to August 1992

 Scottsdale’s September 22 letter purported to be in response to a March 1, 1995, letter from Northland's counsel. No discussion of any earlier contact, or later communications between March and September, is mentioned in that September 22 letter.

 All of Northland’s defense costs in the Ohio Group litigation were funded by Kemper.

 The deposition of Marianne Hall, the principal Scottsdale agent dealing with Northland prior to litigation, suggests that Scottsdale did not appreciate the significance of the policy or Northland’s status as an additional named insured until October 1995, after the sides had begun corresponding.

 Scottsdale’s request for more paperwork may or may not be a demand sufficient to convert Northland’s omission to respond into a waiver.