# United States Court of Appeals
## For the First Circuit

No. 02-2005

GLOBAL NAPs, INC., FRANK T. GANGI,
WILLIAM J. ROONEY, JR. and JANET LIMA,

Plaintiffs, Appellants,

v.

FEDERAL INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lipez, Circuit Judges.

Martin C. Pentz, with whom Nutter McClennen & Fish LLP was on brief, for appellants.
Megan E. Kures with whom Robert P. Powers, and Melick, Porter & Shea, LLP, were on brief, for appellee.

July 17, 2003

**LIPEZ**, **Circuit Judge**.  Plaintiffs Global NAPs, Inc., Frank T. Gangi, William J. Rooney, Jr. and Janet Lima (collectively, "Global NAPs" or "GNAPS") brought this diversity action against defendant Federal Insurance Company ("Federal Insurance"), seeking reimbursement of litigation expenses incurred in the course of  defending a lawsuit brought by Verizon.[1]  At the time Verizon filed its complaint, Global NAPs was covered by a combination insurance policy issued by Federal Insurance that obliged the insurance company "to defend any insured against a suit seeking damages for . . . personal injury."  The policy pertinently defined personal injury as "injury . . . arising out of one or more of the following offenses, committed in the course of your business . . . (B) malicious prosecution."  Global NAPs argues that the Verizon complaint adumbrated[2] a claim for malicious prosecution, see Continental Cas. Co. v. Gilbane Bldg. Co., 461 N.E.2d 209, 212 (Mass. 1984), triggering Federal Insurance's duty to defend the lawsuit.

---

[1]Over the relevant time period, the plaintiffs in the underlying action were alternatively known as Bell Atlantic, New York/New England Telephone and Telegraph Company, and Verizon.  For simplicity, we refer to the plaintiffs as "Verizon" throughout the discussion.

[2]We have previously defined "adumbrate" in the liability insurance context to mean "to give a sketchy representation of; outline broadly, omitting details . . . or 'to suggest, indicate, or disclose partially and with a purposeful avoidance of precision' . . . "  Open Software Found. v. United States Fid. & Guar. Co., 307 F.3d 11, 15n.4 (1st Cir. 2002).

The district court granted the defendant's motion for summary judgment, concluding in a thorough and well-reasoned decision that the Verizon action could not be construed to adumbrate a claim for malicious prosecution. For the reasons that follow, we agree that Federal Insurance was not obligated to defend the Verizon action under the terms of the policy. Accordingly, we affirm the decision of the district court.

## I.

Global NAPs and Verizon are telecommunications carriers offering local telephone service to customers in New York and New England. Under the Telecommunications Act of 1996 (the "Telecom Act"), 47 U.S.C. §§ 201-231 (2002), local exchange carriers must permit competing carriers to interconnect with their telephone networks, thereby allowing customers of different local carriers to connect to each other. Generally, only the carrier of the customer who originates a phone call bills the customer, even though the carrier of the party on the receiving end also incurs costs to connect the call. Thus, if a Verizon customer calls a Global NAPs customer, Verizon would initially bill its customer for the phone call, and then compensate Global NAPs for handing off the call to its own customer. The Telecom Act obliges local exchange carriers to establish "reciprocal compensation arrangements" that govern the originating carrier's obligation to reimburse the terminating carrier. The rates that a terminating carrier may charge are set

-3-

by the public utility commission ("PUC") or public service commission ("PSC") for each state, and are generally based on minutes of use ("MOUs") generated by traffic sent to that carrier's network.

On September 7, 1999, Global NAPs filed an administrative complaint before the New York PSC encompassing two distinct claims. First, Global NAPs alleged that Verizon unlawfully withheld reciprocal compensation for MOUs invoiced in August 1999. The second claim sought a declaration from the PSC that Global NAPs was entitled to the same rate of reciprocal compensation from Verizon for calls terminating with its Internet Service Provider ("ISP") customers as for all other telephone traffic. In February 2000, Global NAPs withdrew its claim for payment of the August 1999 invoice from the PSC complaint. One month later, the PSC issued a declaratory ruling upholding Global NAPs' position on the second claim.

On May 8, 2000, Verizon brought the lawsuit underlying this matter in the United States District Court for the Eastern District of New York. The complaint alleged that Global NAPs had fraudulently billed Verizon for "tens of millions of dollars in reciprocal compensation charges for telephone calls that were never made, or that if made, were of substantially shorter duration than claimed on GNAPs' bills." In total, Verizon articulated nine causes of action in its complaint, including violations of RICO,

the Telecom Act, and the Massachusetts Deceptive Trade Practices Act, as well as breach of contract and unjust enrichment. Of particular significance to this case, Verizon alleged that Global NAPs' prosecution of its administrative complaint before the New York PSC was a "predicate act" supporting RICO liability:

> Defendants' prosecution and maintenance of the New York PSC proceeding relating to the number of MOUs involved was itself a fraud, designed to confuse Bell Atlantic and conceal the nature of Defendants' racketeering activity. Gangi and Rooney in particular submitted papers, and directed GNAPs' counsel to submit papers and take positions, that Defendants knew were false and misleading.

Conspicuously absent from Verizon's lengthy complaint was any cause of action for malicious prosecution arising from Global NAPs' prosecution of the PSC action. Indeed, as the district court observed in its decision, the term "malicious prosecution" does not appear anywhere in Verizon's complaint. Nonetheless, Global NAPs asserts that various references to the PSC proceedings in Verizon's complaint adumbrated a claim for malicious prosecution, triggering Federal Insurance's duty to defend the Verizon action. For the reasons that follow, we disagree.

## II.

### A. Duty to Defend

Both parties agree that Massachusetts law governs this dispute. The Supreme Judicial Court of Massachusetts (SJC) has stated that

the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are "reasonably susceptible" of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense . . . . Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.

Continental Cas., 461 N.E.2d at 212 (quoting Sterilite Corp. v. Continental Cas. Co., 458 N.E.2d 338, 340-41 (Mass. App. Ct. 1983) (internal citations and footnote omitted)).

The SJC has stressed the broad scope of this duty. See Rubenstein v. Royal Ins. Co. of America, 708 N.E.2d 639, 643 n.4 (Mass. 1999) ("An insurer must tread cautiously regarding its duty to defend an insured against third-party actions in view of the expansive interpretation given to that duty."); Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989) ("It is axiomatic that an insurance company's duty to defend is broader than its duty to indemnify."). Accordingly, the absence of any explicit claim for malicious prosecution in the Verizon complaint is not dispositive. We must look beyond the specified causes of action to determine whether the underlying allegations are "'reasonably susceptible' of an interpretation that they state or adumbrate a claim" for malicious prosecution.

Liberty Mut. Ins. Co. v. SCA Services, Inc., 588 N.E.2d 1346, 1347 (Mass. 1992).

## B.  Malicious Prosecution

### 1.  The elements of malicious prosecution

To determine whether the allegations contained in the Verizon complaint state or adumbrate a claim for malicious prosecution, we must first identify the elements of the offense. The district court concluded correctly that the elements of a claim for malicious prosecution are governed by New York law because both the PSC proceeding and the Verizon complaint were filed in New York.  See Ethicon, Inc. v. Aetna Cas. & Sur. Co., 737 F. Supp. 1320, 1332-33 (S.D.N.Y. 1990) (holding that the state where the underlying action is filed should furnish the malicious prosecution standard).  Under New York law

> the elements essential to the maintenance of an action to recover damages for malicious prosecution are: (1) the commencement of a judicial proceeding against the plaintiff, (2) at the insistence of the defendant, (3) without probable cause, (4) with malice, (5) which action was terminated in favor of the plaintiff, and (6) to the plaintiff's injury.[3]

Felske v. Bernstein, 570 N.Y.S.2d 331, 332-33 (App. Div. 1991) (citing Berman v. Silver, Forrester & Schisano,549 N.Y.S.2d 125,

---

[3]As we discuss subsequently, the sixth element of a malicious prosecution claim -- that the plaintiff has suffered an injury -- has been construed by the New York Court of Appeals to require a showing of "special damages."  See Engel v. CBS, Inc., 711 N.E.2d 626, 629-31 (N.Y. 1999).

126 (App. Div. 1989)). Global NAPs resists this doctrinaire conception of malicious prosecution, insisting that this phrase should be understood according to its ordinary meaning and not treated as a legal term of art: "In construing liability insurance policies, the Supreme Judicial Court . . . ordinarily looks to common usage, eschewing reliance upon nice legal distinctions that would not be apparent to the lay policyholder." Global NAPs further argues that employing a lay understanding of malicious prosecution "should lead the Court to find a defense obligation because a reasonable lay insured would expect 'malicious prosecution' coverage to apply to allegations that it had prosecuted a baseless claim to advance a fraudulent scheme."

An "ordinary meaning" approach to construing malicious prosecution claims has been rejected in a majority of jurisdictions:

> Though the meaning of 'malicious prosecution,' as used in a commercial general liability insurance policy, appears to be an issue of first impression under Texas law, many other courts throughout the country have addressed this issue. Most have held that "malicious prosecution" in an insurance policy means the technical legal definition of "malicious prosecution" under the applicable jurisdiction's tort law.

Pennsylvania Pulp & Paper Co. v. Nationwide Mut. Ins. Co., 100 S.W.3d 566, 574 (Tex. App. 2003) (citing cases). In William J. Templeman Co. v. Liberty Mut. Ins. Co., 735 N.E.2d 669 (Ill. App.

Ct. 2000), the court confronted the same argument raised here by Global NAPs:

> The plaintiffs . . . argue that the term "malicious prosecution" in the insurance policies is ambiguous, and that such ambiguity should be construed in their favor. In support the defendant argues that the ambiguity is demonstrated by the differing interpretations of the parties in this case [and] the lack of a definition of "malicious prosecution" in the policy . . . . We find the meaning of the term "malicious prosecution" in this case is clear and unambiguous. The term has long denoted a separate and independent tort catalogued and discussed by Blackstone in the eighteenth century. See 3 William Blackstone, Commentaries (Thomas M. Cooley ed., Callagahan & Co. 1899) (1765). The clear import of that term denotes coverage for an insured who is sued for the established tort of malicious prosecution.

Id. at 678-79.

The long common law history of "malicious prosecution" undermines the ordinary meaning construction advocated by appellants. "It is hardly unreasonable for a drafter of an insurance instrument policy, or any other instrument, to expect that a legal term used in the policy will be accorded the meaning that the courts have given it." Open Software Found. v. United States Fid. & Guar. Co., No. Civ. A. 98-11177-GA, 2001 WL 1298878 at *7 (D. Mass. Aug. 16, 2001); see Western Alliance Ins. Co. v. Gill, 686 N.E.2d 997, 999 (Mass. 1997) (attributing legal rather than ordinary meaning to exclusion provision in liability policy);

Atlantic Mut. Ins. Co. v. McFadden, 595 N.E.2d 762, 764 (Mass. 1992) (same).

We therefore conclude that New York's six-element standard for malicious prosecution claims governs this insurance dispute. We must now determine whether the allegations in the Verizon complaint state or adumbrate a claim for malicious prosecution.

2. The Allegations in the Verizon Complaint

Federal Insurance argues that two required elements of a malicious prosecution claim are not alleged in the Verizon Complaint: 1) a special injury, and 2) a termination of the PSC proceeding in Verizon's favor. We turn first to the special injury requirement, mindful of the narrow scope of our review. As Global NAPs correctly points out, our charge is not to determine whether an allegation of special damages is apparent on the face of the Verizon complaint, or to analyze the merits of any such claim. Continental Cas., 461 N.E.2d at 212; Liberty Mut. Ins. Co., 588 N.E.2d at 1347. To survive summary judgment, Global NAPs need not demonstrate or even allege that Verizon could have proven the existence of special damages resulting from the PSC proceeding. Under well-settled Massachusetts law, our objective is simply to ascertain whether the allegations in the Verizon complaint are reasonably susceptible to an interpretation that they adumbrate, or

sketch, an allegation of special damages. <u>Continental Cas.</u>, 461 N.E.2d at 212.

In <u>Engel</u>, 711 N.E.2d at 626, the New York Court of Appeals addressed the required element of special damages for malicious prosecution claims:

> [I]t seems clear that New York law has deemed special injury to be a necessary consequence of a malicious prosecution . . . . [W]hat is 'special' about special injury is that the defendant must abide some concrete harm that is considerably more cumbersome than the physical, psychological or financial demands of defending a lawsuit.

<u>Id.</u> at 629-31. The <u>Engel</u> court further elaborated that "[a]ctual imposition of a provisional remedy need not occur, and a highly substantial and identifiable interference with person, property or business will suffice." <u>Id.</u> at 631. Global NAPs' position that Verizon adequately alleged special injury is rooted primarily in Paragraph 131 of the Verizon complaint, which reads as follows:

> On or about September 3, 1999, Rooney prepared a complaint for filing with the New York PSC in which GNAPs demanded payment for reciprocal compensation pursuant to the invoices it had sent to Bell Atlantic . . . . In that complaint, Rooney claims that GNAPs is entitled to the full amount of the unpaid invoices, even though he knew that approximately one half of the amount sought arose from the Defendants' criminal fraud involving phantom MOUs, and not from any actual use by or non-fraudulent charge to Bell Atlantic. <u>Rooney wrote and sent the complaint - and thereby commenced the proceeding - with the intention of concealing the fraud from Bell Atlantic, so that GNAPs could continue to collect reciprocal compensation while the MOU</u>

-11-

> dispute dragged on, and with the intention of persuading the PSC to become an unwitting accomplice to Defendants' Phantom MOUs Scheme.

(emphasis added). The appellants' theory is that Verizon alleged in the underlying complaint that Global NAPs' prosecution of its baseless invoice claim before the New York PSC precluded Verizon from uncovering the fraud. As a result, Verizon suffered damages in the amount of their payments for "phantom MOUs" from September 1999 (when the PSC complaint was filed) to February 2000 (when Global NAPs withdrew the invoice claim from the PSC complaint).

Global NAPs can defeat Federal Insurance's motion for summary judgment on this theory only if the Verizon complaint can be read to make the following two assertions: 1) Verizon was in a position to uncover the "phantom MOUs scheme" by September 1999, but 2) Verizon was prevented from doing so by Global NAPs' decision to file the PSC Complaint. Yet the Verizon complaint contains no such assertions (either explicit or implicit). Indeed, critical portions of the complaint actually refute any contention that the PSC proceedings delayed Verizon's discovery of Global NAPs' billing irregularities. The complaint specifies that by late 1998 (nearly a full year before Global NAPs commenced the PSC complaint) Verizon was using a software package called "AcceSS7" that enabled local exchange carriers to monitor the number of MOUs generated by traffic sent to the networks of competing local carriers like Global NAPs. According to the complaint:

-12-

> The AcceSS7 software provided an accurate measurement of the MOUs for which GNAPs was legitimately entitled to receive reciprocal compensation for the periods during which it was used to measure GNAPs' MOUs. The results obtained by use of the AcceSS7 software also provided an accurate basis upon which to estimate the true number of MOUs for which GNAPs was entitled to reciprocal compensation for all other periods.

The Complaint further suggests that Verizon had implemented the software and begun exposing the alleged fraud as early as April 1999, nearly six months before Global NAPs initiated the PSC action:

> Bell Atlantic first measured GNAPs MOUs in April 1999, in the heavily trafficked [area of] Boston, Massachusetts. That check revealed a staggering disparity between the number of MOUs GNAPs invoiced to Bell Atlantic . . . during that month, and the actual number of MOUs for calls handed off to the GNAP's network. In response, Bell Atlantic focused more of its monitoring efforts onto GNAPs, extending its scrutiny to other . . . states. Over the following months, these examinations demonstrated a consistent pattern of massive overstatement of MOUs by GNAPs.

In short, the complaint cannot be read to allege that the PSC action stymied Verizon in its efforts to uncover the fraudulent MOUs scheme, which was actually revealed months earlier with the aid of AcceSS7. Indeed, it was Verizon's use of AcceSS7 to monitor MOUs in the New York area that initially led the company to withhold reciprocal compensation invoiced in August 1999, which in turn prompted Global NAPs to file the invoice claim with the PSC.

-13-

According to Verizon's complaint, the revelation that Global NAPs' MOUs could be independently verified using AcceSS7 led Global NAPs to scale back its fraudulent billing:

> [i]n the months immediately following Bell Atlantic's disclosure, the MOUs for which GNAPs was billing Bell Atlantic began increasing at a markedly slower rate of growth. This flattening of its growth rate occurred at a time when the industry in general continued its rapid expansion. Concerned about Bell Atlantic's scrutiny, Defendants began generating a smaller percentage of phantom MOUs in each invoice.

While it appears that Verizon periodically attempted to obtain documentation from Global NAPs for its invoices, there is no suggestion in the complaint or elsewhere in the record that the information Verizon obtained through AcceSS7 painted an incomplete picture of the fraud in the coverage areas where the software was implemented. The allegations in the complaint do reflect that Verizon had uncovered Global NAPs' fraudulent billing practices, and that Global NAPs was reacting to their discovery in the months preceding the filing of the PSC action. Consequently, Global NAPs' portrayal of the PSC action as a successful obfuscatory tactic is without basis in the complaint.

For reasons that are unclear, it appears that Verizon continued to rely on certain Global NAPs invoices after April 1999, presumably in coverage areas where it had not yet implemented the AcceSS7 monitoring software. What is beyond dispute, however, is

that the timing of Verizon's acceptance and rejection of various Global NAPs invoices does not correspond to the filing and withdrawal of the PSC claim. Not only had Verizon begun to uncover the fraud before the filing of the PSC complaint, but the complaint alleges that the fraud did not end with the February withdrawal of the PSC claim. As of May 8, 2000 (three months after the invoice claim was withdrawn), Global NAPs was allegedly "continu[ing] to transmit fraudulently overstated invoices for phantom MOUs for Rhode Island to Bell Atlantic each month." These allegations further undermine Global NAPs' theory that Verizon's awareness of the fraudulent MOU scheme was somehow tied to the PSC proceedings. In the end, nothing in the complaint explains or even hints at a causal connection between the PSC action and any delayed discovery by Verizon of the phantom MOU scheme. The complaint unambiguously indicates that Verizon had begun uncovering the fraud many months before the PSC action, and that as of April 1999 they were using software that provided reliable measures of the MOUs transferred from their network to Global NAPs.

Massachusetts law directs us to broadly construe and extrapolate from the language of the complaint to determine whether the plaintiff in the underlying action has adumbrated a claim covered by the insurance policy. But we cannot credit a theory of coverage that flatly contradicts facts and assertions made explicit in the complaint. One would have to selectively ignore

-15-

the portions of the complaint excerpted above to construe the complaint as alleging that Global NAPs' prosecution of the PSC action imposed "a highly substantial and identifiable interference with business," Engel, 711 N.E.2d at 631, by obscuring Global NAPs' fraudulent practices.  This we cannot do.

## III.

Because we conclude that the Verizon complaint does not allege the required element of special injury, we need not address the question of whether the PSC proceeding was terminated in Verizon's favor.  The Verizon complaint did not state or adumbrate a claim for malicious prosecution as that offense is defined by New York law.  The decision below is **affirmed**.

**So ordered.**